## MARY ATWOOD ET AL. *v.* REGIONAL SCHOOL DISTRICT NO. 15 ET AL.

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, Js.

Argued October 8—decision released November 25, 1975

*Kenneth H. Murray,* for the appellants (plaintiffs).

*Thomas L. Brayton,* with whom was *John J. Cotter,* for the appellee (named defendant).

BARBER, J. The plaintiffs, taxpayers of the towns of Middlebury and Southbury, brought this action in the Superior Court seeking a declaratory judgment to determine whether a referendum held in those towns resulted in an authorization for the appropriation of funds for the purchase of land, for the construction of a new regional high school, and for alterations to the present high school, and in an authorization to issue bonds and notes to defray that appropriation. The plaintiffs also sought incidental injunctive relief. The court overruled a claim that the plaintiffs lacked the necessary standing as taxpayers to maintain the action and decided that the referendum resulted in a valid appropriation and authorization.

The plaintiffs have appealed, raising the issue of whether the referendum required a majority vote of the regional school district as a whole, pursuant to General Statutes § 10-56, or a majority of each town, pursuant to General Statutes § 10-47c. The parties submitted the case to the trial court upon a written stipulation of facts.

On December 18, 1968, the voters of Middlebury and Southbury by referenda approved a proposal

to join their school systems into a K-12 (kindergarten through grade 12) regional school system, to be known as Regional School District No. 15. Prior to the referenda a temporary regional school study committee had been established pursuant to General Statutes § 10-39, as in effect at that time. The temporary regional school study committee performed its designated function, holding meetings and submitting a report to the participating towns of Middlebury and Southbury and to the state board of education, all as required by General Statutes § 10-43, as in effect at the time. The report of the study committee recommended, among other things, that grades 9-12 be housed in the existing Southbury high school. Subsequent to the referenda, Regional School District No. 15 became operative in the two towns, its affairs being administered by a regional board of education pursuant to the provisions of General Statutes § 10-46.

In October, 1973, the regional board of education submitted a report recommending the purchase, building and equipping of a new school complex for Regional School District No. 15 to be located in the town of Southbury and to be known as Pomperaug Regional High School. After informational public meetings were held in both towns to explain the proposal, a referendum was held December 11, 1973, presenting the question: "Shall Regional School District No. 15 appropriate eleven million seven hundred thirteen thousand dollars, $11,713,000, for purchase of land, construction of a new regional high school and alterations to the present high school, and issue bonds and notes to defray such appropriation?" Middlebury approved the proposal by a plurality of 434 votes, and Southbury rejected it by a plurality of 283 votes. The combined votes

resulted in a plurality of 151 votes in favor of the proposal. Regional School District No. 15 maintains that a majority vote in the regional school district as a whole was sufficient to approve the proposal pursuant to General Statutes § 10-56. Subsequent to the referendum but prior to the bringing of this action, Regional School District No. 15 actually issued tax anticipation notes, purchased real estate, and paid certain items of expense under the construction agreements for said building.

It appears from the stipulation of facts that the plaintiffs are residents, electors owning real estate, and taxpayers of the towns of Middlebury and Southbury who have an interest in all the expenditures made by Regional School District No. 15. It is further stipulated that total reimbursable funds to the regional school district as a result of the bond issue will be $9,178,000. The balance required to be made up by the participating towns will amount to $2,535,000, which will be required to be paid from general funds of the towns to which the plaintiffs pay their taxes.

The plaintiffs' right to seek a declaratory judgment involves the jurisdiction of the court. *Rothkopf* v. *Danbury,* 156 Conn. 347, 352, 242 A.2d 771; *Riley* v. *Liquor Control Commission,* 153 Conn. 242, 248, 215 A.2d 402. A question of jurisdiction once raised must be considered on appeal. *C.S.E.A., Inc.* v. *Connecticut Personnel Policy Board,* 165 Conn. 448, 452, 334 A.2d 909. The defendants raised the question of jurisdiction before the trial court and have pursued it before this court.

An action for a declaratory judgment is a special proceeding. General Statutes § 52-29. Practice

Book § 309 provides that no declaratory judgment may be rendered upon the complaint of any person "unless he has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to his rights or other jural relations." A plaintiff seeking a declaratory judgment must allege and prove more than that he is a taxpayer and has an interest in the expenditures involved. *Gannon* v. *Sanders*, 157 Conn. 1, 7, 244 A.2d 397; *Coyle* v. *Housing Authority*, 151 Conn. 421, 424, 198 A.2d 709. To have standing, a taxpayer must prove that he is directly affected in a pecuniary manner. *Bassett* v. *Desmond*, 140 Conn. 426, 432, 101 A.2d 294; 74 Am. Jur. 2d, Taxpayers' Actions, § 20. Compare *Rothkopf* v. *Danbury*, supra, 354, where the plaintiffs claimed to have standing "in view of their direct voice in the affairs of town government," and this was held to be insufficient. It is clear, given the stipulated facts in this case, that the proposed bond issue would increase the plaintiffs' taxes to some extent. The trial court correctly ruled that the plaintiffs have the requisite interest to maintain this action.

Now we turn to the principal issue, which involves consideration of several sections of part III of chapter 164 of the General Statutes, pertaining to the establishment and operation of regional school districts. A brief preliminary discussion of portions of the statutory scheme set out in part III will aid in understanding the conflicting claims of the parties.

The procedure for establishing a regional school district is as follows: First, a temporary study committee is appointed by the legislative bodies of the towns involved to study the advisability of

establishing a regional school district. General Statutes §§ 10-39, 10-40. The temporary study committee prepares a final report which contains its findings and recommendations concerning the towns to be included, the grade levels to be provided, the facilities to be provided, the size of the board and the number of representatives from each town, estimates of the cost, and similar matters. § 10-43 (a). The state board of education examines the report, determines whether "the proposed plan" complies with the pertinent state regulations, and either accepts or rejects "the recommendations of the committee." § 10-43 (b). If the recommendations are accepted by the state board, the towns involved then hold referenda, the question presented being whether a regional school district shall be established "in accordance with the plan approved by the state board." § 10-45. Once established, a regional board "may build, add to or equip schools for the benefit of the towns comprising the district." § 10-47.

The basic conflict between the parties involves two statutes restricting the powers of the regional board. Section 10-56 permits the board to issue bonds to raise funds for the building of schools, but requires a referendum beforehand with a plurality of the district as a whole approving the issuance.[1] Section 10-47c provides that, with certain exceptions, "the terms of the plan approved through

---

[1] "[General Statutes] Sec. 10-56. CORPORATE POWERS. BOND ISSUES. (a) A regional school district shall be a body politic and corporate with power to sue and be sued; to purchase, receive, hold and convey real and personal property for school purposes; and to build, equip, purchase, rent, maintain or expand schools. Such district may issue bonds in the name and upon the full faith and credit of such district and the member towns to acquire land, prepare sites, purchase or

referenda pursuant to section 10-45" may be amended only after referenda in each town in the district, with a plurality in each town approving the amendment.[2]

The plaintiffs point out that the report of the study committee prior to the establishment of Regional School District No. 15 made no mention of the construction of a new high school, and, in

---

erect buildings and equip the same for school purposes, if so authorized by referendum. Such referendum shall be conducted in accordance with the procedure provided in section 10-47c except that any person entitled to vote under section 7-6 may vote and *the question shall be determined by the majority of those persons voting in the regional school district as a whole. . . .* " (Emphasis added.)

[2] "[General Statutes] Sec. 10-47c. AMENDMENT OF PLAN. With the exception of the terms which pertain to the capital contribution of member towns, the transfer of property to the regional school district, the grades included and the towns to be served by the regional school district, the terms of the plan approved through referenda pursuant to section 10-45 may be amended as follows: If a regional board of education finds it advisable to amend the plan or if the legislative body of a town served by the regional board of education requests amendment of such plan, the regional board of education shall prepare a report on the proposed amendment, including the question to be presented, file a copy with the state board of education and the clerk of each member town and make copies of such report available to the public at a district meeting called to present the plan. After such public hearing, the board shall set the date for referenda which shall be held simultaneously in each member town between the hours of six a.m. and eight p.m. At least thirty days before the date of the referenda, the regional board of education shall notify the town clerk in each member town to call the referendum on the specified date to vote on the specified question. The warning of such referenda shall be published, the vote taken and the results thereof canvassed and declared in the same manner as is provided for the election of officers of a town, except that absentee voting shall not be permitted in other than a special or regular election. The town clerk of each town shall certify the vote of his town to the regional board of education. *If the majority vote in each town of the district is in favor of the proposed amendment to the plan, such amendment shall take effect immediately.*" (Emphasis added.)

fact, recommended that the existing Southbury high school serve as the regional high school. Therefore, plaintiffs contend, the proposal to construct a new high school constitutes an amendment to the plan approved by the referenda of December 18, 1968, and may be approved only by a plurality in each town. The school district, on the other hand, contends that the proposal to issue bonds for the construction of the new high school falls into the category of "bond issues," and need only be approved by a majority in the district as a whole, pursuant to § 10-56.

The defendant contends that the provisions of § 10-47c do not apply to it, basing its argument upon the history of part III. Sections 10-56 and 10-47c originated as two of the twenty-eight sections of the Public Acts 1969, No. 698, which repealed the prior statutes concerning the establishment and operation of regional school districts, and substituted what is now all of part III. Public Act No. 698 introduced the concept of a "plan" for the regional district. Since the referenda establishing Regional School District No. 15 were held prior to the enactment of Public Act No. 698, the question presented was not whether the "proposed plan approved by the state board of education" should be adopted, but whether "a regional school district . . . for the purpose of providing the necessary facilities and administering grades K through 12" should be established. Public Acts 1965, No. 411, § 3. Although § 10-47c provides for the amendment of the "terms of the plan approved through referenda," the fact that the December 18, 1968 referenda did not mention a "plan" does not, despite the defendant's argument to the contrary, automatically exempt Regional School District No. 15 from the

provisions of that section. Although Public Act No. 698 contains no definition of the term "plan," the language of §§ 10-43 and 10-45 compels the conclusion that the "plan" consists of the recommendations found in the final report of the study committee. The recommendations of the study committee for Regional School District No. 15, including those concerning the use of then existent high school facilities, constitute "terms of the plan" for the district as that phrase is used in § 10-47c. The defendant also argues that the provisions of Public Act No. 698 should not be applied retroactively to previously existing districts, but in so arguing it has apparently overlooked § 10-63h which specifically applies Public Act No. 698 to existing districts.

Merely determining that the provisions of § 10-47c literally apply to the proposal to construct a new high school in Regional School District No. 15 does not conclude the issue. The provisions of § 10-56 also literally apply to the issuing of the bonds necessary to build the high school. Both sections cannot be construed as governing the procedure for approving the proposed project. Such a construction would require first a plurality in each town to approve the construction of the school, and then a plurality in the district as a whole to approve the issuance of the necessary bonds. The second approval, though explicitly required by § 10-56, would be reduced to a meaningless formality. Separate parts of an act should, so far as possible, be reconciled and given a reasonable construction. *Hutchison* v. *Board of Zoning Appeals,* 140 Conn. 381, 385, 100 A.2d 839. Courts should not adopt a construction of a statute leading to "difficult and possibly bizarre results." *City Savings Bank* v.

*Lawler,* 163 Conn. 149, 159, 302 A.2d 252; *Muller* v. *Town Planning & Zoning Commission,* 145 Conn. 325, 331, 142 A.2d 524.

By its own terms, § 10-47c does not provide the sole procedure for amendment of the "terms of the plan," in that it excludes from its provision those terms relating to grade levels to be provided, towns to be included, and other specified matters. It is not unreasonable to suppose that terms of the plan relating to areas other than those specifically excluded were also intended to be excepted from the provisions of § 10-47c. This supposition is supported by the fact that though § 10-47c refers to amendments of the terms of the plan generally, § 10-56 specifically provides a procedure for the approval of bond issues. "It is a well-settled principle of construction that specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling. *Charlton Press, Inc.* v. *Sullivan,* 153 Conn. 103, 110, 214 A.2d 354. Where there are two provisions in a statute, one of which is general and designed to apply to cases generally, and the other is particular and relates to only one case or subject within the scope of a general provision, then the particular provision must prevail; and if both cannot apply, the particular provision will be treated as an exception to the general provision. *Kelly* v. *Dewey,* 111 Conn. 281, 292, 149 A. 840." *Meriden* v. *Board of Tax Review,* 161 Conn. 396, 401–402, 288 A.2d 435. Further support for the conclusion that bond issues were intended to be exempt from § 10-47c is found in Public Act No. 74-239 which inserted into § 10-56 the following language: "The exercise of any or all of the powers set forth in this section shall not be construed to

be an amendment of a regional plan pursuant to . . . section 10-47c." "[A]n amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act." *Hartford* v. *Suffield,* 137 Conn. 341, 346, 77 A.2d 760; see also *Erlenbaugh* v. *United States,* 409 U.S. 239, 243–44, 93 S. Ct. 477, 34 L. Ed. 2d 446, and *Brown* v. *Cato,* 147 Conn. 418, 421, 162 A.2d 175.

The removal from the coverage of § 10-47c of those "terms of the plan" relating to the facilities to be provided by the region and estimates of their cost, when combined with the four specific exceptions found in the statute itself, leaves some question as to what remains within its coverage. Clearly, those recommendations of the study committee which concern the size of the regional board, and the number of representatives from each town on the board, can only be altered in accordance with § 10-47c. That the extraordinary requirement of approval by a plurality in each town is a prerequisite to such fundamental changes is not surprising, since such changes directly affect the voting rights of each individual elector. Other matters of fundamental importance, such as the formation or dissolution of a regional district; §§ 10-45, 10-63a; the expansion of a district; § 10-47b (b); or the admission of a new town into the district; §§ 10-39, 10-45; similarly require a plurality approval by each town involved. We conclude that § 10-47c applies only to fundamental amendments of the terms of the plan, and does not apply to the issuance of bonds for the construction of new facilities.

There is no error.

In this opinion the other judges concurred.