# WEST FARMS MALL, LLC *v.* TOWN OF WEST HARTFORD ET AL.
## (SC 17464)

Sullivan, C. J., and Norcott, Katz, Palmer and Flynn, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued March 6—officially released July 11, 2006

*Ralph G. Wellington,* pro hac vice, with whom were *Thomas W. Hazlett, Thomas E. Katon* and *Jesse A. Langer,* for the appellant (plaintiff).

*James A. Wade,* with whom, on the brief, were *Linda L. Morkan* and *Hillel Y. Levin,* for the appellees (named defendant et al.).

*Allan B. Taylor,* with whom were *John B. Nolan* and, on the brief, *Alex G. Filotto,* for the appellees (defendant Blue Back Square, LLC, et al.).

*Opinion*

KATZ, J. This case arises from an agreement between the named defendant, the town of West Hartford (town), and certain private entities for the development of a commercial project in downtown West Hartford known as "Blue Back Square."[1] The dispositive issue in this appeal is whether the trial court properly concluded that the plaintiff, West Farms Mall, LLC, lacked standing to bring suit against the defendants[2] to challenge this agreement. The plaintiff claims that it: (1) has taxpayer standing either because the agreement probably will

[1] According to a website for the project, the name "Blue Back Square" was derived from the nickname of a textbook, penned in 1783 by West Hartford's most famous resident, Noah Webster. See "Blue Back Square," at http://www.bluebacksquare.com/. The textbook, entitled "A Grammatical Institute of the English Language," was used for a century to teach school-children to read, spell and pronounce words and was referred to as the "Blue-backed Speller" because of its blue cover. Id.

[2] In addition to the town, the plaintiff's complaint names as defendants to this action: the West Hartford town council; Barry Feldman, town manager; Blue Back Square, LLC; BBS Development, LLC; Raymond Road Associates, LLC (Raymond Road); Hayes-Velhage Post No. 96 American Legion, Inc. (American Legion); The Grody Company; and Anthony Donatelli, Jr. The complaint alleges that Raymond Road, the American Legion, The Grody Company, and Donatelli own real property and are coapplicants with the town for development approval for Blue Back Square. We refer in this opinion to the town, town council and Feldman as the municipal defendants, and to the remaining defendants as the private defendants. Jointly, they are all referred to as the defendants.

result in an increase to its taxes or because misappropriation of municipal funds constitutes sufficient injury; and (2) otherwise has demonstrated classical aggrievement to establish standing because the agreement unlawfully confers an unfair competitive advantage on Blue Back Square by granting it public benefits that were not given to the plaintiff and other competitors. The plaintiff also claims that the trial court improperly denied its motion to disqualify the municipal defendants' counsel, the law firm of Robinson and Cole, LLC (Robinson & Cole), on conflict of interest grounds. We conclude that the trial court properly dismissed the plaintiff's appeal for lack of standing, and, accordingly, we affirm the judgment.

The record reveals the following undisputed facts and procedural history. The plaintiff owns and operates a large regional shopping mall on the border of West Hartford and Farmington. The mall, which opened in 1974 and thereafter was expanded in 1997, was built entirely with private funds. Through its ownership of the mall, the plaintiff is the town's largest taxpayer, paying approximately $1 million in taxes annually.

Beginning in late 2002, the town began meeting with the defendant Raymond Road Associates, LLC, to discuss the proposed redevelopment of certain property located on Raymond Road and Isham Road. At some point during these discussions, the proposed development expanded to include much of the property that then comprised the town municipal campus, including the library, the town hall, the board of education building and the public green space between and around these buildings. The proposed development area, which ultimately was to become Blue Back Square, is located approximately 2.5 miles from the plaintiff's mall.

The public financing plan for Blue Back Square projected a total cost of $158.8 million, comprised of $48.8

million in public investment in the form of bonds to be issued by the town and $110 million in private investment. According to the plan, the public funds were to be allocated for, inter alia, the purchase of two parking garages, renovation of the town hall, expansion of the library and various improvements to public areas. The private funds were to be allocated for the development of the residential, retail, office and other commercial space.

On January 13, 2004, the town adopted a resolution, which provided in part: "WHEREAS, the Town Council is aware of that the Blue Back Square proposal, if adopted, may have a significant impact on the existing commercial area of West Hartford Center, the surrounding neighborhood and the entire Town . . . the Town Council needs appropriate information to evaluate fully and completely the anticipated [proposal]." The resolution directed the town manager, the defendant Barry Feldman, to "retain the services of independent experts to analyze the potential impact of Blue Back Square . . . including, but not limited to an economic analysis, a traffic analysis and a parking analysis."

On May 11, 2004, the defendant BBS Development, LLC (developer), the town and the other private defendants; see footnote 2 of this opinion; submitted a formal application to the town council for approval of a special services district for the area comprising Blue Back Square and for approval of the development plan for Blue Back Square. At that time, several related proposed resolutions and ordinances also were presented to the town council, including: an ordinance authorizing the issuance of general obligation bonds to pay for improvements for Blue Back Square; a resolution authorizing the execution of the bonds; and a resolution authorizing execution of a master agreement between the town and the developer. All of these matters were set for a joint public hearing with the town council and the town plan

and zoning commission, scheduled to begin on June 10, 2004. The plaintiff alleged, and the defendants denied, that Feldman did not seek, until after the commencement of the public hearings, the independent expert impact assessment required pursuant to the town resolution.[3] At the hearings, Feldman and other town officials spoke in favor of the project and its financial benefits.

On July 14, 2004, the town approved an ordinance making the appropriations aggregating approximately $48.8 million for improvements related to Blue Back Square and authorizing the issuance of the general obligation bonds to fund those appropriations. The town also approved a resolution authorizing the execution of the agreement between the developer and the town that is at issue in the present appeal. Under the agreement, the town was to convey to the developer certain parcels of land, including the town's board of education building.

On November 4, 2004, the plaintiff commenced this action, seeking a declaratory judgment that the town's authorization of execution of the agreement, issuance of bonds and conveyance of public land to Blue Back Square were unlawful and seeking a permanent injunction preventing the town from further action in support of the project. In its amended complaint, the plaintiff alleged that the town: (1) had exceeded its authority by failing to conform to the statutory requirements for a municipal development project; (2) had violated the January 13, 2004 town council resolution requiring the town to obtain independent expert analysis on the impact of Blue Back Square; (3) unconstitutionally had

---

[3] The plaintiff further alleged, and the defendants denied, that the assessment was not independent because it was based on information provided by the developer, and that the public defendants did not make known "formally" certain information in the assessment regarding any risks of the project.

pledged its full faith and credit for the project by its appropriation of funds and issuance of bonds; (4) had conferred benefits on Blue Back Square that constituted exclusive public emoluments or privileges in violation of article first, § 1, of the Connecticut constitution; (5) unlawfully had created a special services district for Blue Back Square that exceeds the statutory powers that may be granted to such districts; (6) had acted arbitrarily and capriciously in approving the issuance of the bonds and the execution of the agreement; and (7) had violated the plaintiff's right to substantive due process and equal protection by granting an exclusive vote to the members of the special services district, who could shift their repayment obligation of the bonds to taxpayers outside the special services district. The plaintiff also alleged that § 177-44 of the West Hartford Code, which permits approval of special services development districts, is void for vagueness.

On December 27, 2004, the municipal defendants filed a verified answer, wherein they asserted several special defenses, including that the plaintiff lacked standing to bring the action, and several counterclaims. They also filed an application for an order to show cause and for a temporary injunction, essentially founded on their position that the plaintiff maliciously had commenced the present action solely for the purpose of delaying the Blue Back Square project so as to prevent competition, and thus sought to enjoin the plaintiff from causing additional delay by compelling it to produce evidence in support of its claim for injunctive relief. On December 29, 2004, the private defendants filed a motion to dismiss the complaint for lack of standing or, in the alternative, for summary judgment. The municipal defendants thereafter orally joined in the motion to dismiss the complaint.

On January 4, 2005, the plaintiff filed a motion seeking to disqualify the municipal defendants' counsel, Rob-

inson & Cole, on the ground of a material conflict of interest. Specifically, the plaintiff contended that: Robinson & Cole has an ongoing relationship with the plaintiff; the firm was representing the municipal defendants in an adverse action against the plaintiff without obtaining the plaintiff's consent; and disqualification would ensure that confidential information that the firm had obtained during its relationship with the plaintiff would not be used inadvertently in the present action. After a hearing on the matter, on January 28, 2005, the trial court denied the motion. It concluded that Robinson & Cole currently did not have an attorney-client relationship with the plaintiff, and thus the conflict rule for former clients controlled. See Rules of Professional Conduct 1.9. The court concluded that a conflict had not been established under that rule because: Robinson & Cole's previous work for the plaintiff did not involve issues substantially related to those in the present matter; the plaintiff had failed to show that Robinson & Cole had confidential information that was likely to be used to the plaintiff's disadvantage; and the plaintiff's delay in taking action against the firm weighed against granting the motion.

Thereafter, in a memorandum of decision dated February 23, 2005, the trial court granted the defendants' motion to dismiss the action, concluding that the plaintiff lacked standing under either taxpayer standing or principles of classical aggrievement.[4] With respect to

---

[4] We note that, although the trial court's memorandum of decision granted the defendants' motion to dismiss the complaint in its entirety, it expressly addressed only eight counts of the complaint, whereas the amended complaint reflects nine counts. The ninth count alleged that the municipal defendants had violated the plaintiff's right to petition the government by attempting to penalize the plaintiff by seeking the temporary injunction. We presume, and the plaintiff does not contend otherwise, that the trial court's decision implicitly dismissed the ninth count as well, given that the court concluded that the plaintiff had failed to show the requisite injury to establish standing to assert its constitutional claims.

taxpayer standing, the court concluded that the plaintiff had not met its burden of proving that its taxes will increase because of the defendants' actions with respect to Blue Back Square. After reviewing the exhibits and testimony offered, the court concluded that its comparison of the net economic benefit to the town *with* the project and the tax revenue of the town *without* the project did not give rise to an inference of taxpayer injury. In light of that conclusion, the trial court also rejected the plaintiff's claim that it otherwise would suffer injury because of an alleged decrease in municipal services and a decrease in the value of the mall, resulting from economic activity shifting from the mall to Blue Back Square due to increased taxes passed on to mall tenants.

With respect to the plaintiff's claim of standing based on classical aggrievement, the trial court concluded that the plaintiff had failed to prove direct injury because the court already had rejected the only injury alleged—an increase in taxes and a decrease in municipal services. Finally, the court rejected the plaintiff's contention that it should be permitted to bring the action despite the lack of standing because there otherwise would be no judicial scrutiny of the municipal defendants' alleged illegal conduct. The court determined that the plaintiff could not establish standing on this equitable ground in light of the fact that "the voters of [the town] approved Blue Back Square in a referendum that followed the town's allegedly improper and unconstitutional actions."[5] Accordingly, the trial court rendered judgment dismissing the complaint.

[5] In their briefs and at oral argument before this court, the defendants indicated that, after the trial court had granted their motion to dismiss, the town's voters approved a second referendum. According to the town's web site, on June 22, 2005, by a two to one vote, town residents responded affirmatively to a second resolution, which asked: " 'Are you in favor of the resolution authorizing the amendment of a previously approved master agreement between the [town] and Blue Back Square, LLC, which provides for the conveyance of real estate by the [t]own to Blue Back Square, LLC;

The plaintiff filed a motion to reargue, which the trial court denied. The plaintiff then appealed from the trial court's judgment to the Appellate Court. Thereafter, the plaintiff filed a motion for articulation, which the trial court also denied. We then transferred the plaintiff's appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The plaintiff raises two broad issues on appeal. First, it claims that the trial court improperly concluded that it lacked standing. The plaintiff contends that the trial court improperly imposed a heightened burden of proof as to taxpayer standing, namely, that its taxes *will* increase, rather than that they *likely* will increase. It further contends that this court should adopt the federal taxpayer standing doctrine, in which misappropriation of tax revenues constitutes an injury that confers standing to challenge such actions. The plaintiff also contends that it is classically aggrieved because the municipal defendants' actions have conferred an unfair competitive advantage on Blue Back Square.

Second, the plaintiff claims that the trial court improperly denied its motion to disqualify Robinson & Cole. The plaintiff contends that the trial court improperly concluded that Robinson & Cole's work on the present action was not substantially related to work the firm performed as the plaintiff's counsel. Specifically, the plaintiff contends that Robinson & Cole, inter alia, assisted the plaintiff in developing legal strategies to address opposition to the plaintiff's previous expan-

the construction of improvements upon [t]own land; the conveyance of real estate by Blue Back Square, LLC to the [t]own; the execution of certain easements, licenses and leases between Blue Back Square, LLC and the [t]own?' " Town of West Hartford, "Blue Back Square," at http://www.west-hartford.com/BlueBackSquare/BlueBackSquare.htm. The plaintiff does not dispute that the voters approved these measures, nor does it contend that it lacked an opportunity at the public hearings to make known its view that the risks associated with the project outweighed its benefits.

sion and development of its mall and thus essentially is playing that same role in assisting the municipal defendants to thwart the plaintiff's opposition to Blue Back Square. Accordingly, the plaintiff contends that Robinson & Cole has confidential information that may be used to the plaintiff's detriment. We conclude that the trial court properly granted the defendants' motion to dismiss for lack of standing, and, accordingly, we do not reach the plaintiff's conflict of interest claim.[6]

Our analysis of the plaintiff's claims is governed by our well established principles of standing generally. "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Sad-*

---

[6] It is well settled that, because the issue of standing implicates the court's subject matter jurisdiction; *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 368, 880 A.2d 138 (2005); it presents the threshold issue for our determination. *Donahue* v. *Southington*, 259 Conn. 783, 792, 792 A.2d 76 (2002). At oral argument before this court, however, the plaintiff suggested that, because Robinson & Cole's improper representation of the municipal defendants essentially tainted the proceedings in which the trial court determined that the plaintiff lacked standing, we first should consider the disqualification issue and remand for a new determination as to standing if we conclude that the trial court improperly denied the motion to disqualify the firm. We decline to consider this suggestion given that, "[i]t is well settled that claims on appeal must be adequately briefed, and cannot be raised for the first time at oral argument before the reviewing court." *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005).

*loski* v. *Manchester*, 228 Conn. 79, 84, 634 A.2d 888 (1993), on appeal after remand, 235 Conn. 637, 668 A.2d 1314 (1995).

"[A] trial court's determination that it lacks subject matter jurisdiction because of a plaintiff's lack of standing is a conclusion of law that is subject to plenary review on appeal. . . . We conduct that plenary review, however, in light of the trial court's findings of fact, which we will not overturn unless they are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Seymour* v. *Region One Board of Education*, 274 Conn. 92, 104, 874 A.2d 742, cert. denied, 546 U.S. 1016, 126 S. Ct. 659, 163 L. Ed. 2d 526 (2005).

I

We begin with the plaintiff's claim that it has taxpayer standing. The plaintiff claims that the trial court improperly imposed a heightened burden on it to prove that the town's actions *in fact* would increase its taxes. It contends that, in accordance with the standard set forth under *American-Republican, Inc.* v. *Waterbury*, 183 Conn. 523, 526, 441 A.2d 23 (1981), the proper standard is that the challenged actions *likely* would result in such an increase. The plaintiff further contends that the burden imposed by the court required it to prove the merits of its claims and, thus, is inconsistent with the principle that standing merely requires a colorable claim of injury. The plaintiff asserts that it established the requisite likely tax increase and that, even if we were to conclude that it had not, we should adhere to federal case law, which holds that a taxpayer has standing to challenge the illegal disposition of tax revenues or the illegal creation of a debt that the plaintiff may be compelled to pay. We reject each of these contentions.

"Connecticut has always recognized the jurisdiction of its courts to entertain suits instituted by taxpayers

to enjoin the officers of a town from performing illegal acts. . . . It is a fundamental concept of judicial administration, however, that no person is entitled to set the machinery of the courts in operation except to obtain redress for an injury he has suffered or to prevent an injury he may suffer, either in an individual or a representative capacity." (Citations omitted.) *Bassett* v. *Desmond*, 140 Conn. 426, 430, 101 A.2d 294 (1953). It is well settled, however, that "[t]here must be more alleged than the mere use by a municipality of tax revenues for an improper purpose in order to confer standing upon a taxpayer who seeks to challenge such action." *Alarm Applications Co.* v. *Simsbury Volunteer Fire Co.*, 179 Conn. 541, 551, 427 A.2d 822 (1980).

Most recently, in *Seymour* v. *Region One Board of Education*, supra, 274 Conn. 103, we reaffirmed our well established burden of proof for taxpayer standing. "The plaintiff's status as a taxpayer does not automatically give [it] standing to challenge alleged improprieties in the conduct of the defendant town. . . . The plaintiff must also allege and demonstrate that the allegedly improper municipal conduct cause[d it] to suffer some pecuniary or other great injury. . . . It is not enough for the plaintiff to show that [its] tax dollars have contributed to the challenged project . . . . [T]he plaintiff must prove that the project has directly or indirectly increased [its] taxes . . . or, in some other fashion, caused [it] irreparable injury in [its] capacity as a taxpayer." (Internal quotation marks omitted.) Id. In that case, wherein the plaintiff had challenged a tax abatement, we held that, "[b]ecause standing is a practical concept, common sense suggests that a taxpayer who challenges a part of a particular governmental program must demonstrate [its] injury in the entire fiscal context of that program, taking into account both the burdens and benefits of the program, and not just by demonstrating that the presumably burdensome part

of the program itself, divorced from the larger program of which it is a part, causes injury." (Internal quotation marks omitted.) Id.

The two-pronged standard of proof—taxpayer status and conduct that has caused or will cause increased taxes or other irreparable injury—is one that this court consistently has articulated since at least 1943. See, e.g., *Cassidy* v. *Waterbury*, 130 Conn. 237, 245, 33 A.2d 142 (1943); *Bassett* v. *Desmond*, supra, 140 Conn. 430; *Austin* v. *Housing Authority*, 143 Conn. 338, 349, 122 A.2d 399 (1956); *Atwood* v. *Regional School District No. 15*, 169 Conn. 613, 617, 363 A.2d 1038 (1975); *Belford* v. *New Haven*, 170 Conn. 46, 53, 364 A.2d 194 (1975), overruled in part by *Manchester Environmental Coalition* v. *Stockton*, 184 Conn. 51, 57 n.7, 441 A.2d 68 (1981); *Alarm Applications Co.* v. *Simsbury Volunteer Fire Co.*, supra, 179 Conn. 549; *Highgate Condominium Assn.* v. *Watertown Fire District*, 210 Conn. 6, 15, 553 A.2d 1126 (1989); *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 695, 600 A.2d 1019 (1991); *Sadloski* v. *Manchester*, supra, 228 Conn. 83. Indeed, it is evident from these cases that a more stringent standard is imposed to assert successfully taxpayer standing than is required to invoke standing on the basis of classical aggrievement. See part II of this opinion (setting forth standard for classical aggrievement).

In *American-Republican, Inc.* v. *Waterbury*, supra, 183 Conn. 526, although this court cited to the preceding line of cases, we embellished the standard set forth therein, noting that the plaintiff must "prove that the transaction involved will *probably* 'result, directly or indirectly, in an increase in his taxes or would, in some other fashion, cause him irreparable injury.' [*Bassett* v. *Desmond*, supra, 140 Conn. 430]." (Emphasis added.) We did not, however, purport therein to change our

long-standing jurisprudence as to the burden of proof.[7] Indeed, as we have stated more recently, to establish taxpayer standing, the plaintiff must demonstrate that injury has or will result. See *Seymour* v. *Region One Board of Education*, supra, 274 Conn. 103. To the extent, then, that *American-Republican, Inc.*, can be read as setting a lower threshold for taxpayer standing, requiring only probable injury, we now expressly disavow that language.

In the present case, the trial court applied the proper standard, considering whether the plaintiff had demonstrated that its taxes would increase if the Blue Back Square project were to proceed as planned, and concluded that the plaintiff had failed to meet that burden.[8]

---

[7] In *American-Republican, Inc.* v. *Waterbury*, supra, 183 Conn. 526-27, the trial court found that the challenged action—a transfer of property from the town's tax roles and the excusal of payment of previously assessed taxes—would in fact result in a decrease in tax revenues. Although the plaintiff's taxes had not yet *in fact* increased as a result of the challenged action, this court concluded that such a consequence logically could be presumed to flow from the decreased revenues attendant to the challenged action. See id.

We note that, in *Sadloski* v. *Manchester*, supra, 235 Conn. 649, we rejected the plaintiffs' reliance on *American-Republican, Inc.*, as establishing "a per se rule conferring standing on all taxpayers whenever a town provides a tax abatement." In so doing, we quoted *American-Republican, Inc.*'s holding that the plaintiff taxpayers in that case "were entitled to the logical inference that a net loss in their tax revenue would probably result in an increase in individual taxes." Id., 649-50. Our intent in citing this language, however, merely was to emphasize that *American-Republican, Inc.*, was distinguishable from the case then before us, in which the overall benefit of the defendant town's plan offset the challenged tax abatement, not to adopt a probable injury standard in contravention to our long-standing case law. Indeed, our discussion of *American-Republican, Inc.*, is preceded by the standard requiring that the plaintiff "prove that the project has directly or indirectly increased her taxes . . . or, in some other fashion, caused her irreparable injury in her capacity as a taxpayer." (Citation omitted; internal quotation marks omitted.) Id., 647.

[8] The private defendants note in their brief to this court that "all the parties agreed that the question before the court was whether the [plaintiff] could establish standing by showing that, in the future, its taxes would probably increase because of Blue Back Square." It is clear, however, that the parties cannot agree to a lesser standard than that required to establish

16

The plaintiff essentially concedes in its brief to this court that it cannot meet that standard because it asserts that project developments, such as the present one, involve "a multitude of factors that bear on its success or failure" and thus are "inherently speculative." Indeed, the plaintiff's theory of injury is predicated entirely on the risks that, in the plaintiff's view, either were inherent in the project as planned or had not been accounted for in the planning process, which in turn could result in an increase in taxes. In other words, the plaintiff's theory of standing largely is predicated on the *probability* of a tax increase triggered by the *likelihood* of certain events. Such a theory is clearly more speculative than the circumstances in which this court found standing to exist in *American-Republican, Inc.* See footnote 7 of this opinion.

For example, the plaintiff contended that the town had failed to account for: future increases on interest rates on the bonds; the possibility that revenues from the parking garage, which were to be used to repay the bonds, might fall below projections; and an increase in school age children using the school system as a result of Blue Back Square employees moving into the town, which would necessitate a new elementary school not currently planned in the town's budget. With respect to these possible scenarios, the trial court discounted much of the testimony of the plaintiff's expert witnesses offered in support of these contentions as predicated

subject matter jurisdiction. See *Rayhall* v. *Akim Co.*, 263 Conn. 328, 337, 819 A.2d 803 (2003) ("[A] subject matter jurisdictional defect may not be waived . . . [or] conferred by the parties, explicitly or implicitly. . . . [T]he question of subject matter jurisdiction is a question of law . . . and, once raised, either by a party or by the court itself, the question must be answered before the court may decide the case." [Citations omitted; internal quotation marks omitted.]).

on an inadequate foundation or speculative.[9] "[I]t is the sole province of the trial court to weigh and interpret the evidence before it and to pass upon the credibility of witnesses. . . . [T]he trial court is not bound by the uncontradicted testimony of any witness." (Internal quotation marks omitted.) *Kelly* v. *New Haven*, 275 Conn. 580, 607 n.31, 881 A.2d 978 (2005). The plaintiff has not claimed, nor does our review indicate, that any of these findings were clearly erroneous.

Moreover, even if the plaintiff could have supported its allegations by a proper foundation, the record does not indicate that it proved that a necessary, or even logical, consequence of these conditions would have been a tax increase by the town, as opposed to some other remedial measure. Finally, we note that, to the extent that the trial court indicated that the plaintiff's witnesses had not demonstrated even a *likelihood* that the plaintiff's property taxes would increase because of the project, it is clear that the plaintiff could not prevail even under the lesser burden of proof that it seeks to invoke. Thus, the trial court properly determined that the plaintiff had failed to establish that its

---

[9] The plaintiff presented testimony from three expert witnesses: Robert Doty, an expert on public finance, who testified that significant financial risks are attendant to the establishment of the special services district and new parking garages; Thomas Muller, an economist, who testified that the town had not considered adequately the financial impact of the bond issue; and Roderyck Blake, a manager of development for the Taubman Company, which is a principal owner of the plaintiff, who testified that increased property taxes to the plaintiff would increase occupancy costs for mall tenants and in turn would cause those tenants to leave the mall for less expensive locations. The trial court found that Doty's knowledge of the Blue Back Square project was minimal—for example, Doty had not reviewed the entire agreement—and that he was unable to offer testimony as to the likelihood that taxes would rise as a result of the project. The court found that the expenditures cited by Muller as having been omitted from the town's plans were "inherently speculative." The trial court also found that Blake did not know the current extent of the tax burden on the plaintiff's tenants or how large a tax increase would cause the plaintiff to lose tenants.

taxes will increase as a result of the town's actions with respect to the Blue Back Square project.

Nonetheless, the plaintiff claims that, even if it failed to establish that the town's actions would cause its taxes to increase, it would suffer " 'other great injury' "; *Alarm Applications Co.* v. *Simsbury Volunteer Fire Co.*, supra, 179 Conn. 549; sufficient to confer taxpayer standing. Specifically, the plaintiff points to standing jurisprudence under federal law and numerous state courts under which alleged misappropriation of public funds provides a basis for standing. See *Massachusetts* v. *Mellon*, 262 U.S. 447, 486, 43 S. Ct. 597, 67 L. Ed. 1078 (1923) ("[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate");[10] *Crampton* v. *Zabriskie*, 101 U.S. 601, 609, 25 L. Ed. 1070 (1879) ("[o]f the right of resident tax-payers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county or the illegal creation of a debt which they in common with other property-holders of the county may otherwise be compelled to pay, there is at

———

[10] In *Massachusetts* v. *Mellon*, supra, 262 U.S. 487, the United States Supreme Court affirmed taxpayer standing in suits against municipal authorities to challenge misuse of funds, but declined to confer standing in suits against the federal government. "The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation. . . . But the relation of a taxpayer of the United States to the Federal Government is very different. His interest in the moneys of the Treasury—partly realized from taxation and partly from other sources— is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." (Citation omitted.) Id. The Supreme Court thereafter recognized taxpayer standing in claims against the federal government, but only for challenges to Congress' power under the tax and spending clause of the federal constitution. See *Flast* v. *Cohen*, 392 U.S. 83, 101–103, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968).

this day no serious question"). The plaintiff asserts that, although this court previously has not addressed standing directly under this theory, we have cited cases doing so with approval. It further asserts that this court has departed from the mainstream by emphasizing personal pecuniary harm to the party asserting the claim apart from this more fundamental injury to all taxpayers.[11]

We recognize that an overwhelming majority of jurisdictions confer standing on taxpayers to challenge the misappropriation of municipal funds.[12] See *Goldman* v.

[11] The plaintiff also claims that, by failing to bring our standing doctrine into uniformity with the federal doctrine, we create the anomaly that a taxpayer would have standing to bring such claims in federal court, but not Connecticut courts. We do not find such an argument persuasive, especially given the limited circumstances in which the federal jurisdictional requirements of diversity of citizenship, amount in controversy or a federal question would be met in such cases. See 28 U.S.C. §§ 1331 and 1332.

[12] "[C]ourts of appeals to consider the question have uniformly concluded that municipal taxpayers have standing to challenge allegedly unlawful municipal expenditures." *United States* v. *New York*, 972 F.2d 464, 471 (2d Cir. 1992). With respect to the states, several have statutes or constitutional provisions conferring taxpayer standing for, inter alia, misappropriation claims. See, e.g., *Chapman* v. *Bevilacqua*, 344 Ark. 262, 268–69, 42 S.W.3d 378 (2001) (taxpayer standing under article sixteen, § 13, of Arkansas constitution); *Coshow* v. *Escondido*, 132 Cal. App. 4th 687, 714, 34 Cal. Rptr. 3d 19 (2005) (taxpayer standing under Cal. Civ. Proc. Code § 526a [Deering 1995]); *Scachitti* v. *UBS Financial Services*, 215 Ill. 2d 484, 493–94, 831 N.E.2d 544 (2005) (taxpayer standing for injunctive relief under 735 Ill. Comp. Stat. Ann. 5/11-301 et seq. [West 2003]); *Tax Equity Alliance for Massachusetts* v. *Commissioner of Revenue*, 423 Mass. 708, 713, 672 N.E.2d 504 (1996) (municipal taxpayers standing under Mass. Gen. Laws c. 40, § 53 [1993 Ed.]); *Rohde* v. *Ann Arbor Public Schools*, 265 Mich. App. 702, 707–708, 698 N.W.2d 402 (2005) (taxpayer standing under Mich. Comp. Laws § 129.61 [2001], provided that taxpayers bring lawsuit on behalf of or for benefit of treasurer of township or school district); *Oklahoma City Urban Renewal Authority* v. *Oklahoma City*, 110 P.3d 550, 554 (Okla. 2005) (taxpayer standing under Okla. Stat. Ann. tit. 62, §§ 372, 373 [West 1997], to recovery of any money or property belonging to city or state unlawfully paid out or transferred by public officer).

In other states, the courts judicially have recognized an exception to the general, special injury rule for taxpayer standing for claims of misappropriated funds. See, e.g., *Bouldin* v. *Homewood*, 277 Ala. 665, 670, 174 So. 2d 306 (1965) (taxpayer standing to challenge illegal disposition of funds or illegal creation of debt or illegal disposition of public property of incorpo-

*Landsidle*, 262 Va. 364, 372, 552 S.E.2d 67 (2001) ("[t]he

rated town); *Bennett* v. *Napolitano*, 206 Ariz. 520, 527, 81 P.3d 311 (2003) (taxpayer standing to challenge expenditure of public funds for illegal or unconstitutional purpose); *Wilmington* v. *Lord*, 378 A.2d 635, 637 (Del. 1977) (taxpayer standing to enjoin unlawful expenditure of public money, or misuse of public property); *King* v. *Herron*, 241 Ga. 5, 6, 243 S.E.2d 36 (1978) (taxpayer standing to challenge legality of municipality's expenditure of public funds even if such funds are derived solely from license fees, fines, or grants from state or federal sources); *Iuli* v. *Fasi*, 62 Haw. 180, 184, 613 P.2d 653 (1980) (taxpayer standing if illegal act creates loss in revenues, resulting in increase in plaintiff's tax burdens or to taxpayers in general and if demand has been made upon proper public officer to take appropriate action, unless facts alleged sufficiently show that demand to bring suit would be useless); *Cook* v. *Bear Stearns & Co.*, 215 Ill. 2d 466, 479–80, 831 N.E.2d 563 (2005) (taxpayer standing to prevent misapplication of public funds, "based upon the tax-payers' equitable ownership of such funds and their liability to replenish the public treasury for the deficiency which would be caused by the misappropriation" [internal quotation marks omitted]); *Cablevision of Chicago* v. *Colby Cable Corp.*, 417 N.E.2d 348, 352–53 (Ind. App. 1981) (taxpayer standing for claim of unlawful collection or expenditure of public funds, when action alleged is clearly or patently illegal); *Price* v. *Commonwealth*, 945 S.W.2d 429, 431 (Ky. App. 1996) (taxpayer standing to challenge constitutionality of city, county and state taxes and expenditures); *Hudson* v. *Bossier*, 823 So. 2d 1085, 1089 (La. App.) (taxpayer standing to ensure that elected representatives obey laws and do not enter into illegal contracts in matters pertaining to public treasury), cert. denied, 831 So. 2d 279 (La. 2002); *Cohen* v. *Ketchum*, 344 A.2d 387, 392 (Me. 1975) (taxpayer standing to seek preventive relief against illegal action by local governmental unit of which plaintiff is resident taxpayer when illegality relates to subject matter of direct interest to any taxpayer, including incurring of governmental indebtedness); *Rukavina* v. *Pawlenty*, 684 N.W.2d 525, 531 (Minn. App.) (taxpayer may, when situation warrants, maintain action to restrain or recover unlawful disbursements of public moneys, but no standing based primarily on disagreement with policy or exercise of discretion by those responsible for executing law), review denied, 2004 Minn. LEXIS 674 (2004); *Inman* v. *Missouri Dept. of Corrections*, 139 S.W.3d 180, 184 (Mo. App. 2004) (taxpayer standing if public funds have been or will be expended due to challenged action); *Midwest Employers Council, Inc.* v. *Omaha*, 177 Neb. 877, 882, 131 N.W.2d 609 (1964) (taxpayer standing, without proof of peculiar interest or injury, to enjoin illegal expenditure of money by public board or officer); *Weeks* v. *Hetland*, 52 N.D. 351, 357, 202 N.W. 807 (1925) ("right of a taxpayer to intervene in his own behalf and on behalf of the public, to prevent the unlawful expenditure and dissipation of public funds, is too well established to require or warrant any further discussion"); *Williams* v. *Huff*, 52 S.W.3d 171, 179–80 (Tex. 2001) (taxpayer standing to enjoin illegal expenditure of public funds but no standing to recover funds previously

right of taxpayers to challenge the legality of expenditures by local governments is a right permitted in almost every state"). The policy rationale for conferring standing in such circumstances, absent the direct and special injury to the taxpayer generally required, has been explained by one court as follows: "The primary basis for taxpayer suits arises from the need to ensure that government officials conform to the law. It rests upon the indispensable need to keep public corporations, their officers, agents and servants strictly within the limits of their obligations and faithful to the service of the citizens and taxpayers. . . . Public policy demand[s] a system of checks and balances whereby taxpayers can hold public officials accountable for their acts."[13] (Internal quotation marks omitted.) *Kinder* v.

expended or challenge expenditures that are merely "unwise or indiscreet"); *Miller* v. *Weaver*, 66 P.3d 592, 600–601 (Utah 2003) (taxpayer standing against municipalities and other political subdivisions of state to enjoin unlawful expenditures or to prevent increased taxes or misapplication of public funds, but no standing to sue individual officials or for declaratory judgment); *Goldman* v. *Landsidle*, 262 Va. 364, 372, 552 S.E.2d 67 (2001) (permitting actions against government officials from allegedly exceeding their powers in manner that would cause injury to locality's taxpayers); see also *Brotman* v. *East Lake Creek Ranch, LLP*, 31 P.3d 886, 891–92 (Colo. 2001) (taxpayer standing to challenge unconstitutional expenditure of public funds, but no standing to challenge unlawful decisions that do not affect public funds and plaintiff as taxpayer); *Alachua County* v. *Scharps*, 855 So. 2d 195, 198 (Fla. App. 2003) (taxpayer standing only if personal injury or claim of violation of tax and spend provision of state constitution); *Butte-Silver Bow Local Government* v. *State*, 235 Mont. 398, 401, 768 P.2d 327 (1989) (taxpayer standing to question validity of tax or expenditure of tax moneys, but only if issue presented directly affects constitutional validity to collect or use proceeds of tax by state or local government entity); *Clapp* v. *Jaffrey*, 97 N.H. 456, 461, 91 A.2d 464 (1952) (taxpayers standing for injunctive relief if town's acts are ultra vires, and need not show any financial loss to town).

[13] Conversely, the rationale for disallowing taxpayer suits, absent special circumstances, has been explained by one court as follows: "This rule is based on the sound policy ground that without a special injury standing requirement, the courts would in all likelihood be faced with a great number of frivolous lawsuits filed by disgruntled taxpayers who, along with much of the taxpaying public these days, are not entirely pleased with certain of the taxing and spending decisions of their elective representatives. It is felt that absent some showing of special injury as thus defined, the taxpayer's

*Holden*, 92 S.W.3d 793, 803 (Mo. App. 2002). Mindful of this rationale, some jurisdictions require more than a mere allegation of misuse of public funds, and instead apply a fact intensive inquiry to determine whether standing is appropriate under the circumstances. See, e.g., *Pittsburgh Palisades Park, LLC* v. *Commonwealth*, 585 Pa. 196, 207, 888 A.2d 655 (2005) (considering whether: "[1] the governmental action would otherwise go unchallenged; [2] those directly and immediately affected by the complained of matter are beneficially affected and not inclined to challenge the action; [3] judicial relief is appropriate; [4] redress through other channels is unavailable; and [5] no other persons are better situated to assert the claim"); see also *Ruckle* v. *Anchorage School District*, 85 P.3d 1030, 1034–35 (Alaska 2004) (permitting "citizen-taxpayer standing" if taxpayer shows that case in question is "one of public significance" and plaintiff is appropriate party to bring action: "the plaintiff must not be a sham plaintiff with no true adversity of interest; he or she must be capable of competently advocating his or her position; and he or she may still be denied standing if there is a plaintiff more directly affected by the challenged conduct in question who has or is likely to bring suit" [internal quotation marks omitted]).

We also recognize that some of our cases implicitly have suggested that misappropriation of funds may provide a basis for standing. See *Bassett* v. *Desmond*, supra, 140 Conn. 432 (plaintiff had standing to challenge legality of town contract paid from town general funds, of

remedy should be at the polls and not in the courts. Moreover, it has long been recognized that in a representative democracy the public's representatives in government should ordinarily be relied on to institute the appropriate legal proceedings to prevent the unlawful exercise of the state or county's taxing and spending power." (Internal quotation marks omitted.) *Dept. of Revenue* v. *Markham*, 396 So. 2d 1120, 1122 (Fla. 1981) (noting that, absent special injury, taxpayer standing only permitted when allegation of violation of state constitution's tax and spend provision).

which revenues were derived in part from plaintiff's taxes; claim based on town's allegedly ultra vires act of transferring funds from one budget appropriation to another to fund contested contract without finding of emergency, prerequisite for such action under local act); see also *Sadloski* v. *Manchester*, supra, 235 Conn. 648 (citing with approval *Higgins* v. *Ambrogio*, 19 Conn. App. 581, 583–84, 562 A.2d 1154 [1989], wherein standing was conferred on basis of allegations of unlawful approval of police chief's accrued benefits); *Cassidy* v. *Waterbury*, supra, 130 Conn. 245 (citing *Crampton* v. *Zabriskie*, supra, 101 U.S. 609, as support for general proposition that "[a] taxpayer is not entitled to an injunction restraining such illegal conduct as the plaintiff claims unless he has suffered a pecuniary or other direct loss in that capacity").

In light of the facts of this case, however, we decline to determine expressly whether a taxpayer has standing to assert a claim predicated on misappropriation of public funds and, if so, what, if any, prerequisites the taxpayer must establish to prevail. It is undisputed that a majority of the town's voters twice have approved by referendum plans associated with Blue Back Square. See footnote 5 of this opinion. Indeed, the plaintiff does not address the trial court's conclusion that there is no equitable reason to allow the plaintiff to prosecute the action in light of the fact that "the voters of [the town] approved Blue Back Square in a referendum that followed the town's allegedly improper and unconstitutional actions." The theory of standing that the plaintiff seeks to invoke, however, is one based entirely on equitable considerations. It is predicated on the notion that the plaintiff is vindicating a right common to all taxpayers, and consequently is relieved of its obligation to prove personal, special injury under the general standing rule. See *Scachitti* v. *UBS Financial Services*, 215 Ill. 2d 484, 493, 831 N.E.2d 544 (2005) ("[a] taxpayer

action is brought by private persons in their capacity as taxpayers, on behalf of themselves and as representatives of a class of taxpayers similarly situated within a taxing district or area, upon a ground which is common to all members of the class, and for the purpose of seeking relief from illegal or unauthorized acts of public bodies or public officials, which acts are injurious to their common interests as such taxpayers" [internal quotation marks omitted]); *In re Remonstrance Appealing Ordinance Nos. 98-004, 98-005, 98-006, 98-007 & 98-008*, 769 N.E.2d 622, 630 (Ind. App. 2002) ("[T]he right of the taxpayer as a personal right is insufficient to establish standing. Rather, the taxpayer must assert a public right the plaintiff has together with the rest of the taxpayers which he represents."); *Kinder* v. *Holden*, supra, 92 S.W.3d 803 ("[t]he private injury that invests standing to a taxpayer is not a purely personal grievance in which other taxpayers have no interest, rather it is an injury shared by the public"); *Fristad* v. *Sherman*, 76 N.W.2d 903, 905 (N.D. 1956) ("A taxpayer's suit does not lie merely to enable a taxpayer to supervise or control the acts of public officers for the taxpayer's own personal advantage even though the acts complained of may be in excess of their authority. In addition to excess or want of authority it must further appear that the threatened act is likely to result in injury to taxpayers and that proper grounds for equitable interference exist.").

This theory also is predicated on the need for a check on public misconduct. See *Kinder* v. *Holden*, supra, 803. Here, it appears that the challenged actions have been checked pursuant to a political process because the voters in essence ratified the action that the plaintiff seeks to have declared as unlawful on the town taxpayers' behalf. The plaintiff has not pointed us to any case law in which standing has been conferred under comparable circumstances. Therefore, even if we were to

adopt the prevailing view and recognize taxpayer standing solely on the basis of a misappropriation claim, we would conclude that the plaintiff was not entitled to invoke such standing under the present circumstances. Accordingly, we conclude that the trial court properly determined that the plaintiff lacks taxpayer standing.

## II

The plaintiff also claims that the trial court improperly determined that it lacked standing under principles of classical aggrievement. "The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: [F]irst, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citation omitted; internal quotation marks omitted.) *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 369–70, 880 A.2d 138 (2005).

The plaintiff contends that the trial court misconstrued its claim of classical aggrievement as substantially predicated on the plaintiff's allegations of increased taxes and decreased municipal services, which the court, when addressing taxpayer standing, had rejected as unsupported by the evidence. Rather, the plaintiff claims that its theory of classical aggrievement was that the town had engaged in unlawful conduct that created an unfair competitive advantage. Specifically, it claims that the town conferred

benefits to Blue Back Square, in the form of the bond financing and the transfer of town property, that it did not make available to other developers, like the plaintiff. In support of this theory, the plaintiff cites *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, 235 Conn. 334, 343–44, 663 A.2d 1011 (1995), and *Connecticut State Medical Society* v. *Board of Examiners in Podiatry*, 203 Conn. 295, 302–303, 524 A.2d 636 (1987).[14] The plaintiff contends that the trial court gave no significance to its evidence of unfair competition because "[the court's] view throughout the proceeding was that 'competitive advantage or disadvantage is not the issue in this case.' "

The defendants contend that the trial court did not misconstrue the plaintiff's theory of classical aggrievement. Rather, they contend that, in the trial court, the plaintiff expressly disavowed a claim based on its status as a competitor and never raised the issue that it now asserts before this court. Therefore, the defendants contend that the plaintiff is not entitled to review on this basis. We agree with the defendants.

The plaintiff's memorandum of law in opposition to the motion to dismiss did not address classical aggrievement specifically. In its posthearing brief, however, the plaintiff contended that it was classically aggrieved because "there is a possibility that the [p]laintiff's property will diminish in value as a result of the [d]efendants' actions." Specifically, the plaintiff pointed to evidence that it claimed demonstrated that: the

---

[14] In *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 235 Conn. 343–44, we explained that, "[a]s a general rule, allegations that a governmental action will result in competition harmful to the complainant's business would not be sufficient to qualify the complainant as an aggrieved person. . . . We have carved out a limited exception to this rule, however, that will permit a finding of aggrievement if the proposed competition is unfair or illegal. [*Connecticut*] *State Medical Society* v. *Board of Examiners in Podiatry*, supra, 203 Conn. 302–303." (Citations omitted; internal quotation marks omitted.)

town's actions would result in an increase in its property taxes; the plaintiff in turn would have to pass on that cost to the mall's tenants; and those tenants would either leave the mall or request a reduction in other occupancy costs to offset that increase. The plaintiff neither discussed unfair competition by virtue of certain benefits conferred nor cited the unfair competition cases that it cites in its appellate brief to this court.[15]

Given the plaintiff's posture, it is unsurprising that the trial court's memorandum of decision did not address classical aggrievement on the basis of unfair competition. Rather, the court indicated that it understood the plaintiff's claim of "other great injury" to be predicated on: decreased municipal services; a decrease in value in the mall as a result of business shifting to Blue Back Square; and other claims based on the likelihood of increased taxes. As to the decrease in the value of the mall, the trial court noted in a footnote that "[t]his [claim] is merely a restatement of the competition claim which the plaintiff has specifically disavowed." The plaintiff did nothing thereafter, either in its motion to reargue or in its motion for articulation, to disabuse the court of that notion, asserting in both motions that the court had failed to address whether the plaintiff was classically aggrieved because of the "possibility that it will suffer a diminution in [the] value of its property as a result of the [d]efendants' conduct."

"[B]ecause our review is limited to matters in the record, we will not address issues not decided by the

---

[15] We wholly reject the plaintiff's reliance on isolated testimony from Blake, the manager of development for the Taubman Company, as to an "unfair competitive advantage." That testimony, which notably was given by the plaintiff's witness on recross-examination, clearly was elicited in the context of responding to the plaintiff's claim that it would lose tenants if its property taxes were to increase as a result of the Blue Back Square project. The plaintiff never explored that issue further with this or any other witness.

trial court." (Internal quotation marks omitted.) *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 620, 830 A.2d 164 (2003). "[T]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *Seymour* v. *Region One Board of Education*, supra, 274 Conn. 105. Therefore, absent any other claim of error by the plaintiff as to the issue of classical aggrievement, we conclude that the trial court properly granted the defendants' motion to dismiss on the ground that the plaintiff lacked standing.[16]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[16] In a footnote in its brief to this court, the plaintiff contends that it raised several grounds for standing that were not considered by the trial court and that, if we were to conclude that it lacks standing on the grounds relied on by that court, we should remand the case to the trial court to consider those other grounds. In support thereof, in a single sentence, the plaintiff gives one such example and then provides a citation to pages in its posthearing brief to the trial court. The defendants contend, and we agree, that this passing reference in a footnote does not constitute adequate briefing for appellate review. See *Knapp* v. *Knapp*, 270 Conn. 815, 823 n.8, 856 A.2d 358 (2004) ("We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where the parties cite no law and provide no analysis of their claims, we do not review such claims." [Internal quotation marks omitted.]). Moreover, to the extent that we can glean from reviewing the referenced portion of the plaintiff's posthearing brief the substance of its legal argument, we note that the two cases cited therein provide no support for the plaintiff's contention.