## W & D ACQUISITION, LLC *v.* FIRST UNION NATIONAL BANK
### (SC 16657)

Borden, Norcott, Katz, Palmer and Zarella, Js.

(*One justice concurring separately*)

Argued October 22, 2002—officially released March 18, 2003

*Bruce L. Elstein,* with whom, on the brief, was *Henry Elstein,* for the appellant (plaintiff).

*Edward P. McCreery III,* with whom was *Peter S. Olson,* for the appellee (defendant).

*Opinion*

BORDEN, J. The dispositive issue in this appeal[1] is whether, as a matter of law, a banking institution has until the "midnight deadline" described in General Statutes § 42a-4-104 (a) (10)[2] to comply with garnishment process under General Statutes § 42a-4-303 (a).[3] The

[1] The plaintiff appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 42a-4-104 (a) (10) provides that the " 'midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later . . . ."

[3] General Statutes § 42a-4-303 (a) provides: "Any knowledge, notice or stop-payment order received by, *legal process served upon,* or set-off exercised by *a payor bank comes too late to terminate, suspend, or modify the bank's right or duty to pay an item or to charge its customer's account for the item if the* knowledge, notice, stop-payment order, or *legal process is received or served and a reasonable time for the bank to act thereon expires* or the set-off is exercised *after the earliest of the following: (1) The bank accepts or certifies the item; (2) the bank pays the item in cash;* (3) the bank settles for the item without having a right to revoke the settlement under statute, clearinghouse rule, or agreement; (4) the bank becomes accountable for the amount of the item under section 42a-4-302 dealing with the payor bank's responsibility for late return of items; or (5)

plaintiff, W & D Acquisition, LLC, claims that the duration of the "reasonable time" period in which to comply with garnishment process pursuant to § 42a-4-303 (a) is not defined by the midnight deadline, but is to be measured by a "reasonable time," considering the facts of the case.[4] We agree with the plaintiff and, accordingly, we reverse the judgment of the trial court to the contrary.

The plaintiff brought this writ of scire facias alleging that the defendant, First Union National Bank, had failed to secure garnished funds held in the accounts of one of its customers, R.K.E. Associates (R.K.E.), which was a defendant in the underlying action. The defendant moved for summary judgment, arguing that it was not obligated to secure the garnished funds until its midnight deadline,[5] at which time only a nominal sum remained in the accounts subject to garnishment. The trial court ruled that, as a matter of law, a banking institution has until that time to secure garnished funds. Accordingly, the court granted the defendant's motion for summary judgment, except as to the nominal sum that remained in the accounts at the midnight deadline, as to which the court rendered judgment for the plaintiff. This appeal followed.

with respect to checks, a cutoff hour no earlier than one hour after the opening of the next banking day after the banking day on which the bank received the check and no later than the close of that next banking day or, if no cutoff hour is fixed, the close of the next banking day after the banking day on which the bank received the check." (Emphasis added.)

[4] The plaintiff also claims on appeal that even if, as a matter of law, the time period for a banking institution to comply with garnishment process pursuant to § 42a-4-303 (a) extended to the midnight deadline, then: (1) that provision would violate the due process clauses of the United States constitution and the constitution of Connecticut; and (2) additional consideration of the timing of "item[s]" under § 42a-4-303 (a) is necessary. Because we agree with the plaintiff's claim that the "reasonable time" period of § 42a-303 (a) does not extend, as a matter of law, to the midnight deadline, we need not address these claims.

[5] See footnote 2 of this opinion. In this case, the midnight deadline would be midnight of the banking day following service of the garnishment process.

The parties presented the following undisputed facts on the motion for summary judgment. The plaintiff is a construction materials supplier that brought an action against R.K.E., a building contractor, for breach of a provisional credit contract. In that action, the plaintiff alleged that it had supplied R.K.E. with $45,436.40 worth of construction materials on credit and that R.K.E. had failed to pay any of that balance. After demonstrating to the trial court that there was probable cause to believe that a judgment would enter in its favor, the plaintiff obtained an ex parte prejudgment garnishment order for up to $70,000 of the goods or estate of R.K.E. to secure the potential judgment. The defendant was one of four named garnishees, all of which were banking institutions where R.K.E. allegedly had deposited funds. At approximately noon[6] on October 27, 1997, the plaintiff served a copy of the writ of garnishment and a copy of the complaint on the defendant at one of the defendant's branch locations in Danbury. At that time, R.K.E. held two accounts with the defendant, which are known here as account 1 and account 2. The balance in account 1 was $34,163.79, and it fluctuated with debits and credits throughout the ensuing hours. The balance in account 2 was $30.54, and it remained at that level throughout the entire relevant time period.

The defendant did not secure the money in either account when the garnishment papers were served. At 3:26 p.m. on that same day, an agent of R.K.E. entered

[6] The parties disputed the exact timing of the service of the garnishment papers. The defendant stated that the garnishment writ was served at approximately 12:20 p.m. The plaintiff stated that the garnishment writ was served before noon. Although each party submitted an affidavit to support its position, the personal knowledge of the defendant's affiant appears to have been hearsay; that affiant did not observe the service of the garnishment writ. By contrast, the plaintiff's affiant was the sheriff who served the papers and, thus, his personal knowledge did not depend upon hearsay. Under the trial court's legal analysis, the exact timing was not material, and it simply found that service occurred at approximately noon.

the same Danbury branch location of the defendant and, by means of a counter withdrawal,[7] withdrew $32,318.26 in cash from account 1, leaving a balance of approximately $1845. Additional credits and debits reduced the balance of account 1 to $200.39 at the close of business on October 27, and $30.43 at the close of business on October 28. At midnight on October 28, 1997, the midnight deadline following the garnishment,[8] the balance of account 1 remained at $30.43.

The plaintiff then brought this writ of scire facias to recover funds that it alleged the defendant should have secured in response to the garnishment. The defendant moved for summary judgment on the basis that it was not obligated to secure the garnished funds until the midnight deadline. The trial court granted the motion, and rendered judgment for the plaintiff in the amount of $60.97, the sum that remained in R.K.E.'s accounts at the midnight deadline.

On appeal, the plaintiff claims that the trial court improperly determined that, as a matter of law, a banking institution has until the midnight deadline described in § 42a-4-104 (a) (10) to comply with garnishment process pursuant to § 42a-4-303 (a). Specifically, the plaintiff claims that General Statutes §§ 42a-4-303 (a) and 52-329[9] require a bank to comply with garnishment process

---

[7] The term "counter withdrawal" refers to the common practice of withdrawing funds from a bank account in person by filling out, signing and presenting a withdrawal slip to a bank teller. The withdrawal slip used in the transaction at issue in this case was a nonnegotiable encoded document, with fields for the account number, name of the account holder, authorized signature, date and dollar amount.

[8] See footnotes 2 and 5 of this opinion.

[9] General Statutes § 52-329 provides in relevant part that *"from the time of leaving [a] copy* [of the necessary garnishment process on a garnishee] all the effects of the defendant in the hands of any such garnishee, and any *debt due from any such garnishee to the defendant . . . shall be secured* in the hands of such garnishee to pay such judgment as the plaintiff may recover. . . ." (Emphasis added.) Nonetheless, the parties agree, as do we, that this provision cannot feasibly or fairly be applied literally, because a bank necessarily requires some period of time from the moment the process

within a "reasonable time" period, the precise duration of which will vary from case to case, depending upon the factual circumstances. We agree with the plaintiff.

First, we set forth the standards of review applicable to the plaintiff's claim. "[T]he standard of review of a trial court's decision to grant a motion for summary judgment is well established. Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Elliott* v. *Waterbury*, 245 Conn. 385, 391, 715 A.2d 27 (1998). Furthermore, the plaintiff's claim presents a question of statutory interpretation "over which our review is plenary. *State* v. *Ehlers*, 252 Conn. 579, 589, 750 A.2d 1079 (2000)." *Waterbury* v. *Washington*, 260 Conn. 506, 547, 800 A.2d 1102 (2002). "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, [231 Conn. 418, 431, 650 A.2d 557 (1994)]. In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment,

---

is left with it to take the practical steps necessary to secure the funds in its depositor's account.

Thus, both sides agree that this provision means that a bank has a reasonable time in which to act. They differ, however, regarding how to measure that reasonable time. The plaintiff contends that the reasonable time must be determined on a case-by-case basis, depending on all of the facts and circumstances. The defendant contends that, as a matter of law, its midnight deadline is the appropriate measurement of what is a reasonable time.

to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Bender* v. *Bender*, [258 Conn. 733, 741, 785 A.2d 197 (2001)]. Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be *the* meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Emphasis in original; internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003).

The statutory provision primarily at issue in this appeal is § 42a-4-303 (a). We first turn to its language. The language of § 42a-4-303 (a) strongly suggests that the relevant time period is a reasonable time depending upon all of the relevant facts and circumstances, rather

than a fixed period terminating on the bank's midnight deadline.

Section 42a-4-303 (a) provides that "[a]ny . . . legal process served upon . . . a payor bank comes too late to terminate, suspend, or modify the bank's right or duty to pay an item or to charge its customer's account for the item if the . . . legal process is received or served and *a reasonable time for the bank to act* thereon expires . . . after the earliest of the following: (1) [t]he bank accepts . . . the item; (2) the bank pays the item in cash . . . ." (Emphasis added.) In other words, under § 42a-4-303 (a), a banking institution is obligated to secure funds within a "reasonable time" after receiving garnishment process, a form of "legal process," to prevent distribution of those funds in response to an "item." The "item[s]" at issue in this case include a withdrawal slip[10] tendered in exchange for $32,318.26 in cash as well as several checks drawn against account 1 in the hours that followed.[11]

Section 42a-4-303 (a) expressly provides that a banking institution must act within a "reasonable time"; it

---

[10] See footnote 7 of this opinion.

[11] Although the parties do not dispute the applicability of the "reasonable time" provision of § 42a-4-303 (a), the plaintiff does suggest, in its reply brief, that the counter withdrawal of cash by the defendant's customer might not have been in payment of an "item" within the meaning of § 42a-4-303 (a). "It is a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 593 n.26, 657 A.2d 212 (1995). In any event, the withdrawal slip that R.K.E. handed to the defendant's teller was an "item" within the meaning of § 42a-4-303 (a). General Statutes § 42a-4-104 (a) (9) defines an " 'item' " as, inter alia, "an . . . order to pay money handled by a bank for collection or payment. . . ." An " '[o]rder' " is defined in General Statutes § 42a-3-103 (a) (6) as "a written instruction to pay money signed by the person giving the instruction. . . ." The withdrawal slip at issue in this appeal was a written instruction to pay out $32,318.26 in cash, handled by a bank, namely, the defendant, for payment, and signed by the agent of R.K.E., who gave the bank the instruction to pay. See footnote 7 of this opinion.

does not expressly provide that a banking institution must act before its midnight deadline. We do not decide the meaning of "reasonable time," as used in § 42a-4-303 (a), in a vacuum. General Statutes § 42a-1-204[12] further defines "reasonable time" as used in § 42a-4-303 (a). Section 42a-1-204 (1) specifically provides that the standards that it contains apply to conduct governed by "this title . . . ." "[T]his title" is title 42a of the General Statutes, the Uniform Commercial Code. The requirement in § 42a-4-303 (a) that a bank act within a "reasonable time," is a provision of the Uniform Commercial Code. Thus, the standards set forth in § 42a-1-204, which define the phrase "reasonable time," apply to § 42a-4-303 (a). Section 42a-1-204 (2) specifically provides: "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." Thus, textually, § 42a-4-303 (a) strongly indicates, by its open-textured language and by virtue of § 42a-1-204 (2), that its meaning is what is normally meant by the statutory use of the phrase "reasonable time," namely, a fact-specific inquiry depending on all of the circumstances of the case.

The conclusion that the phrase "reasonable time" as used in § 42a-4-303 (a) requires a fact-specific inquiry and is not synonymous with the midnight deadline is also consistent with the official commentary of the Uniform Commercial Code dealing with the very same "reasonable time" provision. Section 42a-4-303 is our state's version of § 4-303 of the Uniform Commercial Code. The official commentary to § 4-303 is a part of the circumstances surrounding the enactment of § 42a-4-303

---

[12] General Statutes § 42a-1-204 provides: "(1) Whenever this title requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement.

"(2) What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action.

"(3) An action is taken 'seasonably' when it is taken at or within the time agreed or if no time is agreed at or within a reasonable time."

(a), and, as such, is relevant to the legislature's intent. Cf. *Flagg Energy Development Corp.* v. *General Motors Corp.*, 244 Conn. 126, 136–39, 709 A.2d 1075 (1998) (applying official comment 1 to § 2-503 of the Uniform Commercial Code to aid in construction of General Statutes § 42a-2-503). Official comment 6 to § 4-303 of the Uniform Commercial Code provides in relevant part: "In the case of . . . legal process the effective time for determining whether [it was] received too late to affect the payment of an item and a charge to the customer's account by reason of such payment, is receipt plus a reasonable time for the bank to act on [the service of process] . . . . Usually, a relatively short time is required to communicate to the accounting department advice of one of these events but certainly some time is necessary. . . . " Thus, the official commentary unequivocally states that the time period is variable and depends upon the factual circumstances. It makes no mention of the bright-line rule created by the midnight deadline.

This conclusion is consistent with what we perceive to be the purpose of § 42a-4-303 (a), namely, to balance the interests of the garnishor in securing its potential debtor's funds against the need for the bank to have the necessary time in which to take the steps necessary to effectuate that security. Although, as the defendant suggests, a midnight deadline would give a bank more certainty and, in all likelihood, more time to take those steps, we see nothing in either the language or the purpose of the statute to justify that bright-line rule.

The defendant relies, as did the trial court, on *Normand Joseph Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 646 A.2d 1289 (1994), for the proposition that the "reasonable time" period, applicable to the present case, extended to the midnight deadline. We are not persuaded. The court in *Normand Joseph Enterprises, Inc.*, held that a different statute,

namely, General Statutes § 52-367a, controlled the issue before it, which, unlike the present case, involved a priority dispute between a judgment execution and a bank setoff. Id., 498–501. Section 52-367a expressly defines the time period for a banking institution to act in response to the service of a judgment execution as follows: "Such banking institution shall act upon such execution according to section 42a-4-303 *before its midnight deadline*, as defined in section 42a-4-104. . . ." (Emphasis added.) The court interpreted this language to mean that, when served with an execution, a bank has until its midnight deadline to act thereon. Id., 502. It stated: "It is reasonable for us to effectuate [the policy advanced by § 52-367a] by assuming that the legislature intended 'before its midnight deadline' to modify 'act upon such execution.' " Id., 500. As we have indicated previously, no such express incorporation of the midnight deadline exists in the text of § 42a-4-303.

It is true that the court in *Normand Joseph Enterprises, Inc.*, also stated that *"[i]f* § 52-367a does not incorporate the midnight deadline directly, the statute must be interpreted as requiring a bank to act within a reasonable time." (Emphasis added.) Id., 501. The court reasoned that, in that event, there would be an implied reasonable time requirement that would, by analogy to General Statutes §§ 42a-4-301[13] and 42a-4-

---

[13] General Statutes § 42a-4-301 provides: "(a) If a payor bank settles for a demand item other than a documentary draft presented otherwise than for immediate payment over the counter before midnight of the banking day of receipt, the payor bank may revoke the settlement and recover the settlement if, before it has made final payment and *before its midnight deadline*, it (1) returns the item; or (2) sends written notice of dishonor or nonpayment if the item is unavailable for return.

"(b) If a demand item is received by a payor bank for credit on its books, it may return the item or send notice of dishonor and may revoke any credit given or recover the amount thereof withdrawn by its customer, if it acts within the time limit and in the manner specified in subsection (a).

"(c) Unless previous notice of dishonor has been sent, an item is dishonored at the time when for purposes of dishonor it is returned or notice sent in accordance with this section.

302,[14] incorporate the midnight deadline. Id., 501–503. That reasoning is not controlling in the present case, however, because it was dictum.

The statute in *Normand Joseph Enterprises, Inc.*, namely § 52-367a, *did* contain a provision that expressly incorporated the midnight deadline, and the court determined that that provision applied to the facts of the case before it. Id., 503. Our conclusion, namely, that the court's reasoning that incorporates the midnight deadline contained in other statutes was dictum, is bolstered by the court's final passage in that part of its opinion. After reiterating the conclusion "that § 52-367a imposes a midnight deadline on a bank served with an execution"; id.; the court then stated that "*[a]lternatively*, if § 52-367a has no express time limitation for transactions that are not governed by § 42a-4-303, the bank must act within a reasonable time, and that reasonable time period is, by analogy, defined as the midnight deadline . . . ." (Emphasis added.) Id.

"(d) An item is returned: (1) As to an item presented through a clearinghouse, when it is delivered to the presenting or last collecting bank or to the clearinghouse or is sent or delivered in accordance with clearinghouse rules; or (2) in all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to instructions." (Emphasis added.)

[14] General Statutes § 42a-4-302 provides: "(a) If an item is presented to and received by a payor bank, the bank is accountable for the amount of: (1) A demand item, other than a documentary draft, whether properly payable or not, if the bank, in any case in which it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor *until after its midnight deadline*; or (2) any other properly payable item unless, within the time allowed for acceptance or payment of that item, the bank either accepts or pays the item or returns it and accompanying documents.

"(b) The liability of a payor bank to pay an item pursuant to subsection (a) is subject to defenses based on breach of a presentment warranty under section 42a-4-208 or proof that the person seeking enforcement of the liability presented or transferred the item for the purpose of defrauding the payor bank." (Emphasis added.)

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion NORCOTT, KATZ and PALMER, Js., concurred.

ZARELLA, J., concurring. I concur in the result reached by the majority but would base the analysis on the plain language of General Statutes § 42a-4-303 (a) and the definition of the term "reasonable time" contained in General Statutes § 42a-1-204.

The issue in this case can be simply stated. What is the meaning of the term "reasonable time" contained in § 42a-4-303 (a), a term which is defined in § 42a-1-204? Despite the lack of any possible ambiguity in the use of the term, the majority finds it necessary to reach beyond the clear text of the statute and the relevant definitions contained in title 42a of the General Statutes[1] to use the official comments to the Uniform Commercial Code (code) to analyze the issue further. This analysis highlights one of the many problems inherent in the methodology[2] first expressed in *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003), in which

---

[1] Title 42a of the General Statutes contains the Uniform Commercial Code, as adopted by the Connecticut General Assembly.

[2] The majority cites to *Flagg Energy Development Corp.* v. *General Motors Corp.*, 244 Conn. 126, 136–39, 709 A.2d 1075 (1998) (*Flagg*), in support of the proposition that "[t]he official commentary to § 4-303 [of the code] is a part of the circumstances surrounding the enactment of § 42a-4-303 (a), and, as such, is relevant to the legislature's intent." While I recognize that the court in *Flagg* determined that comment 1 to § 2-503 of the code did not support the position that the plaintiffs espoused in that case; id., 136–37; the court in *Flagg* initially determined that title 42a of the General Statutes did not provide an express definition of the phrase "tender of delivery" contained in General Statutes § 42a-2-725 (2). Id., 137 ("Textually, that language [of General Statutes § 42a-2-503] does not address what constitutes a 'tender of delivery.' Nowhere else does the statutory text of article 2 of the [code] contain an express definition of the phrase."). Unlike the court in *Flagg*, the majority in the present case is armed with a statutory definition of the term "reasonable time," yet it continues to search for the meaning of that term even though neither party suggests that the definition is unclear.

a majority of this court proclaimed the death of the plain meaning rule. See id., 563, 570.

The majority in the present case begins its analysis by stating that the term "reasonable time" contained in § 42a-4-303 (a) "strongly suggests that the relevant time period is a reasonable time . . . ." This truism, I would suggest, should lead the majority to conclude that the phrase "reasonable time" is not merely suggestive but, rather, dispositive. Any doubt that the majority had regarding this term should have been dispelled entirely, however, when it reviewed the definitions contained in title 42a of the General Statutes. Both the term "reasonable time" and the term "midnight deadline" are defined in § 42a-1-204 and General Statutes § 42a-4-104 (a) (10), respectively, and, as the majority correctly notes, those terms are not synonymous.

Undaunted by the simplicity of this analysis, the majority insists on analyzing the issue further by reference to the official comments[3] to the code as an *additional tool* of statutory construction. See id., 566. The majority states that "[§] 42a-4-303 is [this] state's version of § 4-303 of the . . . [c]ode," and that § 4-303 contains the very same "reasonable time" provision found in § 42a-4-303. The majority further states that "[t]he official commentary to § 4-303 is a part of the circumstances surrounding the enactment of § 42a-4-303 (a), and, as such, is relevant to the legislature's intent."

---

[3] While the comments to the code are akin to legislative history, they are not entitled to the same weight. As commentators have noted, "[c]ertainly the comments are not entitled to as much weight as ordinary legislative history. In some states the comments were not placed before the enacting body prior to adoption of the [c]ode. Indeed, some of the present comments were not even in existence at the time the section to which they are now appended was adopted." 1 J. White & R. Summers, Uniform Commercial Code (3d Ed. 1988) § 4, p. 14. Furthermore, the legislature has not officially adopted the official comments to the code as part of this state's statutory framework.

The use of commentaries when the language of a statute is clear and unambiguous and the terms in question are statutorily defined prompts the question, "to what end?" If the comments accompanying the code dictated a different conclusion than that dictated by the clear text and definitions contained in the statutes, would the majority then disregard the text and definitions in the statutes? If not, then what is the purpose of considering the comments at all in this instance? In my view, the clear and unambiguous nature of the text of the statutes demands that this court adhere to that text without further analysis. To do otherwise implies that, in the case of a conflict, this court would disregard the plain meaning of the statutes in favor of the "circumstances surrounding" the enactment of the code, i.e., the unadopted comments to the code. I suggest, stubbornly I admit, that the principles of statutory construction set forth in my recent dissent in *Courchesne*; see id., 633–37 (*Zarella, J.*, dissenting); derive support from the majority's rationale in the present case.

Accordingly, I concur.