ALVORD INVESTMENT, LLC, ET AL. *v.* ZONING
BOARD OF APPEALS OF THE CITY
OF STAMFORD ET AL.
(SC 17755)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued January 9—officially released May 15, 2007

*Brenden P. Leydon*, with whom was *David W. Rubin*, for the appellants (defendants).

*Michael J. Cacace*, with whom was *Jane W. Freeman*, for the appellees (plaintiffs).

*Edward M. Rosenblatt* and *David S. King* filed a brief for the Real Property Section of the Connecticut Bar Association as amicus curiae.

NORCOTT, J. The principal issue in this zoning appeal is whether the Common Interest Ownership Act (act), General Statutes § 47-200 et seq., allows for the creation of a common interest community comprised solely of airspace units. The defendants, the zoning board of appeals (board) of the city of Stamford (city) and the owners of neighboring properties (residents),[1] appeal[2] from the judgment of the trial court sustaining the appeal of the plaintiffs, Alvord Investment, LLC (Alvord) and the Stop and Shop Supermarket Company (Stop & Shop), from the board's reversal of the zoning enforcement officer's decision to permit the plaintiffs to construct a Super Stop & Shop on property included within a common interest community in which the plaintiffs have a leasehold interest. The defendants claim that the trial court improperly concluded that (1) the plaintiffs were aggrieved by the board's decision, (2) the plaintiffs were not required to obtain subdivision approval prior to receiving a zoning permit, and (3) the proposed Super Stop & Shop met the classification of "Food Shops, Retail" established in the city zoning regulations. We affirm the judgment of the trial court.

The record reveals the following facts and procedural history. The property in question is owned by Cytec Industries, Inc. (Cytec), and consists of approximately thirty-five acres located at 1937 West Main Street in the city (Cytec property). Cytec operates a chemical research and development laboratory on this site. Cytec executed a ground lease, notice of which was recorded in the city land records on February 4, 2004, leasing

---

[1] The residents include 60 Alvord Lane, LLC, Daniel Stoni, Anthony Femia and R. Kenneth Cosentino.

[2] The Appellate Court granted the plaintiffs' petition for certification to appeal from the judgment of the trial court; see General Statutes § 8-9; and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

the entire site to Stamford Labs Realty Holdings, LLC (Stamford Holdings), for a term of eighty-five years. On the same day, Stamford Holdings recorded a declaration creating a common interest leasehold planned community[3] to be known as the West Main & Alvord Commercial Park, and through the declaration, submitted the community to the provisions of the act.

The declaration created three airspace units within the planned community, labeled units A, B and C. The present case focuses primarily on the series of leases and transfers involving unit A, an airspace unit that extends over approximately seven acres of the Cytec property. Stamford Holdings leased unit A to Stamford Labs Realty-A, LLC, for a period of seventy-five years, which then subleased it to Alvord for seventy-five years minus two days. Alvord, in turn, sub-subleased unit A to Stop & Shop for a period of twenty-five years. The lease from Alvord to Stop & Shop also included a not-yet-constructed one-story building and improvements.

The Cytec property is subject to the city's zoning regulations, which classify the parcel as located in a "light industrial" zone. Stamford Zoning Regs., Appendix A, Land Use Schedule. This classification allows the property owner to make many uses of the property as of right, including a "Food Shops, Retail" use. Id. In January, 2002, pursuant to this zoning classification of

---

[3] A common interest community is "real property described in a declaration with respect to which a person, by virtue of his ownership of a unit, is obligated to pay for (A) real property taxes on, (B) insurance premiums on, (C) maintenance of, or (D) improvement of, any other real property other than that unit described in the declaration. . . ." General Statutes § 47-202 (7). A " '[p]lanned community' " is a residual concept used to refer to "a common interest community that is not a condominium or a cooperative. . . ." General Statutes § 47-202 (23). A " '[l]easehold common interest community' " is "a common interest community in which all or a portion of the real property is subject to a lease the expiration or termination of which will terminate the common interest community or reduce its size." General Statutes § 47-202 (18).

the Cytec property, the plaintiffs originally applied to the zoning enforcement officer for a permit to construct a retail food shop/grocery store. At that time, the plaintiffs intended to accomplish their plans via a ground lease with an option to purchase between Cytec and Starwood Ceruzzi, LLC, the developer of the proposed supermarket,[4] notice of which was filed in the city land records in March, 2002. That lease was canceled pursuant to a termination agreement filed on August 12, 2003, after discussions between the plaintiffs, the zoning enforcement officer and the city's corporation counsel led to the conclusion that the proposed lease arrangement likely would require the plaintiffs to seek subdivision approval. Long before they filed the termination agreement, and at least as early as June, 2002, the plaintiffs decided to modify their development plan by declaring a common interest community, rather than proceeding with the original lease arrangement. To that end, Stamford Holdings created the West Main & Alvord Commercial Park via a declaration dated December 4, 2003, and filed on February 4, 2004. After nearly two years of review of the plaintiffs' application for a zoning permit, during which each of the city departments with an interest in the proposed development approved the application, the zoning enforcement officer approved the plaintiffs' application for a zoning permit on December 12, 2003. The zoning enforcement officer published notice of that approval on December 30, 2003, pursuant to General Statutes § 8-7.

On January 9, 2004, the residents appealed from the issuance of the zoning permit to the board. The board held a public hearing on the appeal on March 24, 2004, and at a subsequent meeting held on April 28, 2004, voted four to one to reverse the zoning enforcement

[4] Louis Ceruzzi, the managing member of Starwood Ceruzzi, LLC, also owns the majority interest in Alvord, and therefore has the same interests in the proposed project as the plaintiffs.

officer's decision to issue the permit to the plaintiffs. The board published notice of its decision on May 13, 2004, and the plaintiffs timely appealed from that decision to the trial court pursuant to General Statutes § 8-8.[5]

The plaintiffs challenged the board's reversal of the zoning enforcement officer's decision on several grounds. They claimed, inter alia, that the board: (1) lacked jurisdiction to determine whether subdivision approval was required for the plaintiffs' proposed development of the Cytec property; (2) improperly had concluded that the plaintiffs were required to seek subdivision approval from the planning commission because their plan for the property constituted a "de facto" subdivision; and (3) improperly had weighed factors not relevant to the issuance of a zoning permit, such as concerns of neighboring property owners, traffic issues and whether the common interest community consisted of common uses. The defendants argued in response that (1) the plaintiffs lacked standing because they had failed to meet the requirements for forming a common interest community and, therefore, could not show that they were aggrieved by the decision of the board, and (2) the supermarket failed to classify as "Food Shops, Retail" under the zoning regulations because it "is really in the nature of a department, retail-style store as opposed to a traditional grocery store."

The trial court addressed the jurisdictional issues first and concluded that (1) the plaintiffs had standing to bring the appeal because they had complied with the act and, therefore, were aggrieved by the board's decision, and (2) it lacked the jurisdiction to determine whether the board had exceeded its authority in

[5] General Statutes § 8-8 (b) provides in relevant part: "[A]ny person aggrieved by any decision of a board . . . may take an appeal to the superior court for the judicial district in which the municipality is located. . . ."

determining that subdivision approval was required because the plaintiffs had failed to raise that issue before the board, so that the doctrine of exhaustion of remedies barred that claim. The trial court then sustained the plaintiffs' appeal and specifically concluded that (1) the plaintiffs were not required to seek subdivision approval from the planning commission before obtaining a zoning permit for their development, and (2) the proposed supermarket is a permitted use under the applicable zoning laws. This certified appeal followed. See footnote 2 of this opinion.

On appeal, the defendants claim that the trial court improperly: (1) concluded that the plaintiffs were aggrieved by the decision of the board because it misconstrued certain provisions of the act; (2) determined that the plaintiffs' development plans did not constitute a subdivision; and (3) determined that the proposed supermarket properly was classified as "Food Shops, Retail."

I

WHETHER THE PLAINTIFFS WERE AGGRIEVED BY THE BOARD'S DECISION

We begin by reviewing the defendants' threshold claim that the trial court improperly determined that the plaintiffs were classically aggrieved by the decision of the board. "It is well settled that [p]leading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal. . . . It is [therefore] fundamental that, in order to have standing to bring an administrative appeal, a person must be aggrieved. . . . Standing [however] is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions

which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . .

"Aggrievement presents a question of fact for the trial court and the party alleging aggrievement bears the burden of proving it. . . . We do not disturb the trial court's conclusions on appeal unless those conclusions are unsupported by the subordinate facts or otherwise violate law, logic or reason." (Citations omitted; internal quotation marks omitted.) *Bongiorno Supermarket, Inc.* v. *Zoning Board of Appeals*, 266 Conn. 531, 537–39, 833 A.2d 883 (2003).

"The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: [F]irst, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *West Farms Mall, LLC* v. *West Hartford*, 279 Conn. 1, 25, 901 A.2d 649 (2006).

The defendants conceded before the trial court that, if the documents establishing the lease arrangement complied with the requirements of the act, then the plaintiffs had "established a leasehold interest sufficient to prove that they are classically aggrieved." The defendants contend, however, that Stamford Holdings failed to declare properly the creation of a common interest community, so that any and all documents purporting

to grant a lessee interest in the community must be null and void. The defendants' claim requires us to determine whether the declaration creating the West Main & Alvord Commercial Park was properly executed under the act, specifically General Statutes § 47-220 (b),[6] which requires that all units in a common interest community be "substantially completed" at the time of the filing of the declaration. If, as the defendants claim, the declaration could not have been filed until the proposed supermarket was "substantially completed," the plaintiffs are not aggrieved, and we have no jurisdiction over this appeal.

The defendants' claim with regard to the issue of aggrievement, therefore, turns on our construction of various provisions of the act. Issues of statutory construction raise questions of law, over which we exercise plenary review. See *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 231, 915 A.2d 290 (2007). "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply." (Internal quotation marks omitted.) Id.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent

---

[6] General Statutes § 47-220 provides: "(a) A common interest community may be created pursuant to this chapter only by recording a declaration executed in the same manner as a deed and, in a cooperative, by conveying the real property subject to that declaration to the association. The declaration shall be recorded in every town in which any portion of the common interest community is located and shall be indexed in the grantee's index in the name of the common interest community and the association and in the grantor's index in the name of each person executing the declaration.

"(b) A declaration, or an amendment to a declaration adding units, may not be recorded unless all structural components of all buildings containing or comprising any units thereby created are substantially completed in accordance with the plans, as evidenced by a recorded certificate of completion executed by a registered engineer, surveyor or architect."

of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *State*, 278 Conn. 77, 82, 896 A.2d 747 (2006).

The following additional facts are relevant to this appeal. The declaration filed by Stamford Holdings included a series of maps of the property, which included a certificate of completion signed by a licensed surveyor, certifying that unit A did not contain any buildings and, therefore, was substantially completed.[7] On January 12, 2005, the plaintiffs recorded an amended declaration and a similar series of maps that included a nearly identical certificate of completion.

Section 47-220, which governs the creation of common interest communities, provides that a common interest community may be created "only by recording a declaration executed in the same manner as a deed . . . ." General Statutes § 47-220 (a). The declaration "may not be recorded unless all structural components of all buildings containing or comprising any units

---

[7] The certificate provided in relevant part: "I hereby certify to the best of my knowledge and belief: 1. That there are no buildings constructed on Units A or Unit C of West Main & Alvord Commercial Park, therefore all Units are substantially completed. 2. That all structural components of the buildings located on Unit B of West Main & Alvord Commercial Park are substantially completed . . . . 4. This Certificate is made pursuant to the provisions of [General Statutes §§] 47-220 (b) and 47-228 . . . ."

thereby created are *substantially completed* in accordance with the plans, as evidenced by a recorded certificate of completion executed by a registered engineer, surveyor or architect." (Emphasis added.) General Statutes § 47-220 (b).

The defendants argue that the certificate of completion is invalid because the Stop & Shop building was not substantially complete on February 4, 2004; indeed, construction had not even begun at that time. The plaintiffs counter that they complied with the requirements of § 47-220 (b) because, as the surveyor stated, unit A did not contain any buildings at the time of its creation, so that it was substantially completed at the time of filing. They also contend that they were not required to file a certificate of completion at all because the West Main & Alvord Commercial Park contains units defined as airspace only,[8] so that no building constructed on the property would ever contain or comprise a unit. The defendants argue in response that the provisions of the act do not allow for the creation of airspace units, which they characterize as a fiction that would permit developers to subvert subdivision regulations and severely limit the ability of towns to regulate development in their borders. We disagree, and conclude that the act allows for the creation of airspace units such as those that form the West Main & Alvord Commercial Park.

This dispute requires us to examine for the first time certain provisions of the act, which our legislature first adopted in 1983; Public Acts 1983, No. 83-474; and later amended in 1995. "The act is a comprehensive legislative scheme regulating all forms of common interest ownership that is largely modeled on the Uniform Com-

---

[8] The horizontal boundary of the units in the West Main & Alvord Commercial Park is described in the declaration as consisting of the surface of the land, while the vertical boundaries consist of vertical planes as shown on the survey, "extending to the heavens . . . ."

mon Interest Ownership Act [uniform act]," which was most recently amended in 1994. (Internal quotation marks omitted.) *Weldy* v. *Northbrook Condominium Assn., Inc.*, 279 Conn. 728, 735, 904 A.2d 188 (2006).[9] Because only one other state has adopted the 1994 uniform act,[10] other states' case law under the uniform act is of limited value in this case. See, e.g., *Evans* v. *General Motors Corp.*, 277 Conn. 496, 513–14, 893 A.2d 371 (2006); *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 34–35, 699 A.2d 101 (1997). This renders the official commentary to the uniform act particularly relevant to our analysis of our state's act because it sheds light on the intent of the commissioners responsible for drafting the provisions that subsequently were adopted by our legislature. See *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 739–40, 873 A.2d 898 (2005); *W & D Acquisition, LLC* v. *First Union National Bank*, 262 Conn. 704, 712–13, 817 A.2d 91 (2003).

With that background in mind, we first turn to General Statutes § 47-202 (26), which defines " '[r]eal property' " as "any leasehold or other estate or interest in, over, or under land, including structures, fixtures, and other improvements and interests that by custom,

---

[9] "The act addresses the creation, organization and management of common interest communities and contemplates the voluntary participation of the owners." (Internal quotation marks omitted.) *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 735. The prefatory note to the uniform act indicates that it was intended to combine "in a single comprehensive law, prior uniform laws in this area (the Uniform Condominium Act [1980], the Uniform Planned Community Act [1980], and the Model Real Estate Cooperative Act [1981])"; Unif. Common Interest Ownership Act of 1994, 7 U.L.A. 836 (2005); with the goal of achieving "uniformity among all three forms of ownership . . . ." Id., 839.

[10] Only Connecticut and Vermont have substantially adopted the 1994 uniform act. See Unif. Common Interest Ownership Act of 1994, 7 U.L.A. 835 (2005). Alaska, Colorado, Minnesota, Nevada and West Virginia continue to operate under the 1982 version of the uniform act. See Unif. Common Interest Ownership Act of 1982, 7 U.L.A., Pt. II, p. 1 (2002 & 2006 Sup.).

usage, or law pass with a conveyance of land though not described in the contract of sale or instrument of conveyance. *'Real property' includes parcels with or without upper or lower boundaries, and spaces that may be filled with air or water.*" (Emphasis added.) The same definition appears in § 1-103 (26) of the uniform act, which uses the phrase " '[r]eal estate.' " Unif. Common Interest Ownership Act of 1994, 7 U.L.A. 846 (2005). The official commentary to § 1-103 explains that the definition deliberately is "very broad" in order to allow for property descriptions that include the third dimension, because "[i]n most condominium and planned communities . . . as in so-called 'air rights' projects, ownership does not extend 'from the center of the earth to the heavens' because units are stacked on top of units or units and common elements are interstratified. In such cases, the upper and lower boundaries must be identified with the same precision as the other boundaries." Id., 852, comment. In the comments accompanying § 2-109 of the uniform act, which outlines the requirements for plans and surveys of the property that must be filed with the declaration and corresponds to General Statutes § 47-228, the drafters state: "[A] condominium or planned community unit may consist of unenclosed ground and/or airspace, with no 'building' involved." Id., 898, comment.

We next examine § 47-202 (31), which defines " '[u]nit' " as "a physical portion of the common interest community designated for separate ownership or occupancy, the boundaries of which are described pursuant to subdivision (5) of subsection (a) of section 47-224. . . ." General Statutes § 47-224 (a) (5) provides in relevant part that a declaration of a planned community must contain "a description of the boundaries of each unit created by the declaration, including the unit's identifying number . . . ." Additionally, General Statutes § 47-221 (1), in providing a modifiable standard for

determining which parts of a common interest community constitute units and which parts constitute common elements, includes the following language: "*If walls, floors or ceilings are designated as boundaries of a unit . . . .*" (Emphasis added.) Our examination of the Connecticut act and the uniform act, therefore, supports our conclusion that the boundaries of a unit of a common interest community are not limited to walls, ceilings, and floors, but rather indicate that the legislature intended to provide a mechanism for creating units filled with air.

Having established that a unit of a common interest community may consist entirely of airspace, we return to the specific language of § 47-220 (b), which provides that a declaration "may not be recorded unless all structural components of *all buildings containing or comprising any units* thereby created are substantially completed . . . ." (Emphasis added.) This language clearly does not apply to the plaintiffs' arrangement, which is a common interest community composed of airspace units that does not involve buildings "containing or comprising" units. The plaintiffs, therefore, were not required to file a certificate of completion with their declaration in order to comply with the provisions of the act because the filing requirement on its face applies to more traditional common interest communities, such as those comprised of condominium buildings.[11]

---

[11] The language of the uniform act provides additional support for our conclusion. Section 47-220 (b) is based on § 2-101 (b) of the uniform act, which differs from our statute by its inclusion of the words "[i]n a condominium" before "a declaration . . . may not be recorded unless . . ." 7 U.L.A. 879. This difference demonstrates that the drafters of the uniform act intended for the requirements of subsection (b) to apply only to condominiums, which would protect purchasers by "insur[ing] that a purchaser will in fact take title to a unit which may be used for its intended purpose." Id., 880, comment. Therefore, the policy concerns behind the substantial completion requirement, namely, protecting the legitimate expectations of a unit owner in a traditional residential condominium, are not implicated by an arrangement such as the plaintiffs' commercial leasehold planned

In support of their claim that units may not consist solely of airspace, the defendants rely on a recent decision in which the Rhode Island Supreme Court concluded that "[a] unit is not created simply by describing a parcel of real estate, whether or not it be airspace only, and designating it as a unit (or a master unit) in a declaration of condominium." *America Condominium Assn., Inc.* v. *IDC, Inc.*, 870 A.2d 434, 442 (R.I. 2005). Unlike Connecticut, however, Rhode Island has not adopted the uniform act, and operates instead under the more restrictive Uniform Condominium Act of 1977 as amended in 1980, 7 U.L.A., Pt. II, p. 199 (1997), which renders inaccurate the defendants' characterization of our sister state's statute as "virtually identical legislative language . . . ." Moreover, the Rhode Island decision was based on the laws in place in 1988, the year in which the "master declaration" at issue in that case was filed. *America Condominium Assn., Inc.* v. *IDC, Inc.*, supra, 436. As our sister court notes in its opinion, the Rhode Island Condominium Act was amended in 1991 to include language permitting the creation of condominiums containing "land-only units," which "would have provided defendants with a novel opportunity to create units without having commenced the construction of any buildings." Id., 441 n.5. The defendants' reliance on this decision is, therefore, misplaced.

---

community. Indeed, the drafters of the uniform act acknowledged in their official comments that "[t]he requirement of completion would be irrelevant in some types of common interest communities, such as campsite condominiums or some subdivision planned unit developments where the units might consist of unimproved lots and the airspace above them, within which each purchaser would be free to construct or not construct a residence. Any residence actually constructed would ordinarily become a part of the 'unit' by the doctrine of fixtures, but nothing in this [a]ct would require any residence to be built before the lots could be treated as units." (Emphasis added.) Id., 882, comment. It is clear, therefore, that the drafters of the uniform act contemplated the creation of common interest communities consisting of airspace units.

Accordingly, we conclude that the act allows for the creation of common interest communities consisting entirely of airspace units. With such a community, the requirement of substantial completion simply is inapplicable, and the declaration may be filed prior to any anticipated construction of buildings within the unit. Therefore, the trial court properly concluded that the plaintiffs were aggrieved by the board's decision.

## II

### WHETHER THE COMMON INTEREST COMMUNITY REQUIRED APPROVAL AS A SUBDIVISION

The defendants also contend that the trial court improperly concluded that the planned community did not constitute a division of the Cytec property that required the plaintiffs to seek subdivision approval from the planning commission. They argue, in essence, that the unit lines drawn by the declaration actually are divisions of the land for building purposes, so that approval by the city planning commission was a prerequisite to the issuance of a zoning permit. The plaintiffs contend that the defendants again misconstrue the act, this time by failing to recognize that the Cytec property has not been divided—the *land* is still owned as one parcel. We agree with the plaintiffs, and conclude that the trial court properly determined that there was no division of the land that would require subdivision approval.

We first set forth the applicable standard of review. "Generally, it is the function of a zoning board . . . to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. The trial court had to decide whether the board correctly interpreted the section [of the regulations] and applied it with reasonable discretion to the facts. . . . In

applying the law to the facts of a particular case, the board is endowed with . . . liberal discretion, and its action is subject to review . . . only to determine whether it was unreasonable, arbitrary or illegal. . . . Moreover, the plaintiffs bear the burden of establishing that the board acted improperly. . . .

"Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight . . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when [an] agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . . These principles apply equally to regulations as well as to statutes." (Citations omitted; internal quotation marks omitted.) *Wood* v. *Zoning Board of Appeals,* 258 Conn. 691, 697–98, 784 A.2d 354 (2001). The defendants' claim involves questions of law that we have not considered previously. Our review is, therefore, plenary. See id., 699.

The city exercises its zoning power pursuant to its charter, which was authorized by a special act of the legislature.[12] 26 Spec. Acts 1228, No. 619 (1953). "The

---

[12] "Municipalities in Connecticut may exercise zoning power either by adopting the provisions of chapter 124 of the General Statutes, §§ 8-1 through 8-13a, or by enacting a municipal charter authorized by a special act of the legislature. . . . In either case, the power of the local zoning authority to adopt regulations is limited by the terms of the statute or special act." (Citation omitted; internal quotation marks omitted.) *Smith* v. *Zoning Board of Appeals,* 227 Conn. 71, 81 n.7, 629 A.2d 1089 (1993), cert. denied, 510 U.S. 1164, 114 S. Ct. 1190, 127 L. Ed. 2d 540 (1994).

charter serves as an enabling act, both creating power and prescribing the form in which it must be exercised. . . . The charter is the source of authority governing subdivisions, except if there is a clear legislative intent that the General Statutes control." (Citations omitted; internal quotation marks omitted.) *Smith* v. *Zoning Board of Appeals*, 227 Conn. 71, 82, 629 A.2d 1089 (1993), cert. denied, 510 U.S. 1164, 114 S. Ct. 1190, 127 L. Ed. 2d 540 (1994); see also *Sheridan* v. *Planning Board*, 159 Conn. 1, 4, 266 A.2d 396 (1969) ("[w]ith the exception of certain provisions contained in chapters 124 and 126 of the General Statutes . . . planning and zoning in Stamford are governed by . . . the Stamford charter [1953], rather than by the General Statutes"). We, therefore, look to the Stamford charter and to the zoning and subdivision regulations adopted by the zoning and planning boards pursuant to the charter in order to determine whether the plaintiffs' proposed development constitutes a subdivision, which would require approval by the city planning board.[13]

Section C6-30-19 of the Stamford charter provides that " 'subdivision' shall mean the division of a tract or parcel of land into two or more lots for the purpose, whether immediate or future, of sale or building development, expressly excluding development for agricultural purposes, and shall include resubdivision."[14] Stamford subdivision regulation § 2.14 similarly defines "subdivision" in relevant part as "the division of a lot, parcel or tract of land into two or more lots or other division of land for the purpose, whether immediate or

---

[13] Section C6-30-1 (3) of the Stamford Charter grants the planning board exclusive "power of approval or disapproval of the subdivision of land . . . ." Section C6-30-18 of the charter provides that any building "erected [in an unapproved subdivision] shall be deemed an unlawful structure, and the City through the appropriate officer may bring action to enjoin the erection of such structure or to cause it to be vacated or removed."

[14] General Statutes § 8-18 is substantially similar, except that it applies when a parcel of land is divided into three, rather than two lots.

future, of building development . . . ." The subdivision regulations define "lot" as "a parcel or portion of land separated from other parcels or portions by description as a subdivision or record survey map, by metes and bounds for purpose of sale, lease, or transfer." Stamford Subdivision Regs., § 2.5. The city's zoning regulations define "[l]ot" as "[a] parcel of land occupied or to be occupied by a building or a group of buildings and their accessory uses, or for storage space, including such open spaces as are required by these regulations and such other open spaces as are arranged, designed and/ or used in connection with such buildings." Stamford Zoning Regs., art. II, § 3A.55.

These regulatory definitions make it clear that a division of the land must take place in order to trigger subdivision review; accordingly, the question before us is whether the creation of a common interest community consisting of airspace units divides the underlying property. The defendants claim that the unit lines drawn by the plaintiffs divided the Cytec property into three separate lots for the purposes of building development. The plaintiffs argue in response that the declaration divides only the ownership of the airspace above the Cytec property, not the land itself, which remains one lot and an undivided common element in the common interest community. We agree with the plaintiffs.

We already have concluded that the act provides for the creation of airspace units. See part I of this opinion. Section 4.03 (b) of the West Main & Alvord Commercial Park declaration describes the lower horizontal boundary of the units as "the surface of the 'land,' " and further provides that "[a]ll space below the surface of the 'land' is undivided and is a Common Element. The space below each Unit is allocated as a Limited Common Element . . . ." The declaration also describes one of the common elements of the planned community as "the portion of the land which lies below the boundary

described in Subsection 4.03 (b) . . . ." The declaration, therefore, clearly states that the land underlying the commercial park, namely, the entire thirty-five acre Cytec property, remains one undivided lot. Consistent with the declaration, the documents on file in the city land records indicate that, in eighty-five years, upon the expiration of the leases that allowed for the creation of the commercial park, the entire lot again will become the property of Cytec, free of any leasehold interest. The Cytec property, therefore, has not been divided so as to require subdivision approval.

The defendants argue that General Statutes § 47-204 (b) (1) supports their contention that the units created by the declaration are in fact separate pieces of property, created through a division of land which required subdivision approval. Section 47-204 (b) (1) concerns taxing and assessing a common interest community, and provides, inter alia, that, in a planned community: "If there is any unit owner other than a declarant, each unit that has been created, together with its interest in the common elements, constitutes for all purposes a separate parcel of real property." In directing our attention to this statutory provision, however, the defendants overlook the definition of "unit owner." Section 47-202 (32) defines " 'unit owner' " as "a declarant or other person who owns a unit, or a lessee of a unit in a leasehold common interest community whose lease expires *simultaneously* with any lease the expiration or termination of which will remove the unit from the common interest community . . . . In a condominium or planned community, the declarant is the owner of any unit created by the declaration. . . ." (Emphasis added.) Pursuant to this definition, the *only* unit owner in the West Main & Alvord Commercial Park is the declarant, Stamford Holdings. In order for the plaintiffs to be unit owners, the termination of their leases would have to coincide with the termination of the lease that

created the planned community. No units will be removed from the common interest community until the expiration of the ground lease between Stamford Holdings and Cytec, which will occur on December 3, 2088. Stop & Shop's lease has a term of twenty-five years,[15] Alvord's lease expires on December 2, 2078, and Stamford Labs Realty-A, LLC's lease expires the following day. Therefore, the plaintiffs are not "unit owners" as defined by the act, and the only unit owner is the declarant, so that the language contained in § 47-204 provides no support for the defendants' argument.

The defendants also argue that the plaintiffs chose to execute their development plan via a common interest community with the sole intention of evading subdivision review and the attendant public hearing. The transcript of the board's decision indicates that several board members were of the opinion that the plaintiffs' establishment of a planned common interest community would leave the city helpless to regulate the use of the Cytec property. Although it is true that the ownership arrangement established by the plaintiffs does not require subdivision approval, the city is not powerless to regulate the plaintiffs' development of the property. The city has always had control over the Cytec property through the enforcement of its zoning regulations. The regulations adopted by the board enabled it "to divide the city into zoning districts of such number, shape and area as may be deemed best suited to carry out these regulations and provide for their enforcement . . . ." Stamford Zoning Regs., art. I, § 1.A; see also Stamford Charter § C6-40-1. The Cytec property is designated as an "M-L" zone for "light industrial" uses under city regulations. Stamford Zoning Regs., Appendix A, Land Use Schedule. Permitted uses within an M-L zone

---

[15] The twenty-five year lease period begins on the "[c]ommencement [d]ate," which, under the lease terms, is the day the Super Stop & Shop and all other improvements to unit A are substantially completed.

include "Food Shops, Retail," which, as we discuss more fully in part III of this opinion, encompasses grocery stores such as the one the plaintiffs plan to build. Therefore, the city exercised its regulatory powers and determined permissible uses for the Cytec property when it designated the lot as appropriate for multiple light industrial uses. Once it did so, Cytec, as the property owner, had the absolute right to put its land to any use that is consistent with its zoning classification. The city further exercised its powers through the zoning permit application process, during which the plaintiffs' plans were scrutinized and approved by several city departments, including the assessor's office, the tax collector, coastal management, environmental protection, flood plain, fire marshal, health, traffic, the building official and finally, the zoning enforcement officer.[16] In order to gain the approval of the zoning enforcement officer, the plaintiffs were required to comply with height, bulk, frontage, parking and square footage requirements. Moreover, the city will have the opportunity to enforce its regulations both during and after construction of the Super Stop & Shop, prior to issuance of the building's certificate of occupancy.

In short, our conclusion that the plaintiffs have not divided the property and, therefore, need not submit to subdivision review, does not render the city powerless to monitor the plaintiffs' development of the Cytec

---

[16] The zoning permit process is conducted pursuant to the city zoning board's power to "regulate the height, number of stories and size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land or trade, industry, residence or other purposes; and the height, size, location and character of advertising signs and billboards." Stamford Charter § C6-40-1. The city zoning board also has the authority to divide the city into zoning districts, "and, within such districts, it may regulate the erection, construction, reconstruction, alteration or use of buildings or structures and the use of land. . . ." Id.

property. Rather, the city has always had, and will always retain, the power to regulate the *use* of the Cytec property through its zoning regulations. It does not, however, have the power to regulate the *ownership* of the property, and a common interest community is a form of ownership.

## III

## WHETHER THE PROPOSED SUPERMARKET IS A "FOOD SHOPS, RETAIL" USE

Finally, we address the defendants' claim that the trial court improperly concluded that a Super Stop & Shop does not fall within the ambit of the "Food Shops, Retail" classification contained within the city zoning regulations. The defendants argue that because the proposed supermarket will contain a bakery, a pharmacy and a bank, "it should not be classified as 'Food Shop[s], Retail' but rather as a 'Department Store,' 'Shopping Center' or 'Retail Store, Discount,' which are not permitted uses" on the Cytec property, which is zoned as "light industrial." We disagree.

We note at the outset that the record is not clear about whether the board ever decided the "Food Shops, Retail" issue. Although the issue was raised in the *testimony* before the board at the public hearing, it was not mentioned by the board members in their remarks before their vote on the residents' appeal of the issuance of the permit. The trial court acknowledged this situation by stating that "[t]he record clearly shows that the subject [Super] Stop & Shop meets the classification of 'Food Shops, Retail' as set forth in the zoning regulations. . . . Any determination by the [board] to the contrary is not supported by the record." Ordinarily, this court will not address issues that were not the subject of an administrative decision. Because it is unclear, however, whether the board based its decision in part on the "Food Shops, Retail" issue, the trial court

did rule on the issue and, if left undecided, the issue may be the subject of a subsequent appeal by the defendants regarding the same development, we will consider the merits of the defendants' claim, based on the assumption that the board determined that the plaintiffs' development was not a permitted use for the Cytec property under the zoning regulations.

Before addressing the merits of this claim, we set forth the standards that govern our review. "Resolution of this issue requires us to review the relevant town regulations. Because the interpretation of the regulations presents a question of law, our review is plenary. . . . Additionally, zoning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Moreover, regulations must be interpreted in accordance with the principle that a reasonable and rational result was intended . . . . The process of statutory interpretation involves the determination of the meaning of the statutory language [or in this case, the relevant zoning regulation] as applied to the facts of the case, including the question of whether the language does so apply. . . . In the present case, that process requires us to examine the language of the regulation . . . ." (Citations omitted; internal quotation marks omitted.) *Graff* v. *Zoning Board of Appeals*, 277 Conn. 645, 652–53, 894 A.2d 285 (2006).

With these principles in mind, we now turn to the defendants' claim that the proposed supermarket is not a permitted use on the Cytec property because it does not fall within the ambit of the "Food Shops, Retail" classification. It is undisputed that the Cytec property is in an M-L zone, and that "Food Shops, Retail" are permitted on property that is located in such a zone. Stamford Zoning Regs., Appendix A, Land Use Schedule. It is also undisputed that the Cytec property may

be put to multiple uses and contain multiple buildings as of right under its zoning classification. The zoning regulations, however, do not define "Food Shops, Retail," so the question of whether the proposed Super Stop & Shop constitutes a permitted use cannot be solved simply by analyzing the language of the regulations. See *Graff* v. *Zoning Board of Appeals*, supra, 277 Conn. 653 and n.5 (using "extratextual sources that provide guidance as to the regulation's scope" because regulation is not plain and unambiguous).

The proposed Super Stop & Shop will be an 82,880 square foot one-story building. As part of the zoning permit application process, the plaintiffs provided detailed information regarding the areas of the store that would be used for food, storage, store operations, nonfood, utility, a bank and a pharmacy. The plaintiffs produced evidence during the permit application process and before the board that demonstrated that over 90 percent of the proposed development will be dedicated to the "intended main use for the facility," which is "Food Shops, Retail," while less than 7 percent of the store will be devoted to "certain accessory uses . . . that are customarily incidental to the main use." The plaintiffs also documented in detail the breakdown of the nonfood products that would be sold by the supermarket, by linear and cubic shelf footage and by percentage of the store's expected sales. The zoning enforcement officer testified before the board that: "I had them document more than anybody probably in history ever had to document what they're going to have on their shelves, cubic values of how much space is going to be used for nonfood items. That supermarket, that food shop retail complies in every, way, shape to zoning." He also testified that "the definition we have for food shop retail is pretty much one that doesn't exist with the exception of what we have for past prac-

tice, which is grocery store supermarket, the Grade A, ShopRite, Stop & Shop. They're all food shop retails."

In the absence of a definition for "Food Shops, Retail," the pattern of past practice is strong evidence that the proposed Super Stop & Shop is a permitted use on the Cytec property. "[A]lthough this court is not bound by a zoning board's interpretation of its regulations, a board's reasonable, time-tested interpretation is given great weight." *Jalowiec Realty Associates, L.P.* v. *Planning & Zoning Commission*, 278 Conn. 408, 414, 898 A.2d 157 (2006). Any decision to the contrary by the board was not supported by the evidence that was before it. We conclude, therefore, that the plaintiffs' development was properly classified as "Food Shops, Retail."[17]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[17] The plaintiffs also set forth two alternate grounds for affirmance and two adverse rulings to be reviewed in the event of remand. Because we affirm the judgment of the trial court, we need not address these claims.